United States Court of Appeals,

Fifth Circuit.

No. 91–3855.

EMPLOYERS INSURANCE OF WAUSAU, in its own right, and as Representative of Those Certain American Underwriters Subscribing to Certificate No. 14880, Etc., et al., Plaintiffs–Appellants,

v.

OCCIDENTAL PETROLEUM CORPORATION, et al., Plaintiffs–Appellees,

v.

AVONDALE SHIPYARDS, INC., et al., Defendants.

OCCIDENTAL PETROLEUM CORPORATION, et al., Plaintiffs,

v.

AVONDALE SHIPYARDS, INC., et al., Defendants.

Dec. 10, 1992.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before VAN GRAAFEILAND,[*] KING, and EMILIO M. GARZA, Circuit Judges.

KING, Circuit Jue:

Plaintiff–Appellant Employers Insurance of Wausau ("Wausau"), in its own right and as representative of certain American Underwriters,[1] filed a cross-claim against Plaintiff–Appellee Occidental Petroleum Corporation ("Occidental"), seeking to recover marine insurance policy proceeds paid to Occidental in 1982 under a reservation of rights. Occidental moved for summary judgment. The district court granted the motion and dismissed Wausau's cross-claim with prejudice. Wausau now appeals the district court's order granting summary judgment. For the following reasons, we affirm the judgment of the district court.

---

[*]Senior Circuit Judge, of the Second Circuit, sitting by designation.

[1]Wausau filed suit on behalf of the following American Underwriters subscribing to Certificate No. 14880, a time hull insurance policy: Chiyoda Fire and Marine Insurance Company; Rochdale Insurance Company; Unigard Mutual Insurance Company; Unione Italiana Reinsurance of America; United Americas Insurance Company; The Netherlands Insurance Company; United States Fidelity & Guaranty Company; and Inland Underwriters Insurance Agency.

# I. BACKGROUND

This insurance dispute arises from the sinking of the Oxy Producer, the tug unit of the Oxy Producer ITB,[2] on September 20, 1981. Events occurring before and after this date, however, are relevant to our disposition of the case. Accordingly, we recount the events leading up to and following the sinking of the Oxy Producer.

## A. Events Preceding the Sinking of the Oxy Producer

After agreeing to manufacture, sell, and transport superphosphoric acid to the Soviet Union in the early 1970's, Occidental arranged for the construction of three catamaran ITBs. Numerous parties were involved in the construction project. Occidental first retained Hvide Marine International, Inc. ("Hvide") to supervise the design and construction of the vessels. Hvide, in turn, contracted with a naval architectural firm, J.J. Henry Co. ("Henry"), to prepare the plans and specifications for the vessels. After Hvide assigned the architectural contract with Henry to Occidental, Occidental engaged Avondale Shipyards, Inc. ("Avondale") to construct the vessels. Avondale thereafter subcontracted with Victoria Machine Works, Inc. ("Victoria") to manufacture the bumper pads for the vessels' catug interconnection system.

Before construction of the three ITBs was finished, Occidental and Hvide obtained insurance for the vessels in the American and London markets. The unit of the vessel at issue in this case, the Oxy Producer, was insured under Certificate No. 14880, a time policy of hull and machinery insurance. The policy was to become effective on the date that the Oxy Producer ITB was delivered. The agreed-upon value of the Oxy Producer under this policy was $36,000,000. The American Underwriters, primarily through Wausau, subscribed to 28% of the risk under the policy.

## B. Events Surrounding the Sinking of the Oxy Producer

The Oxy Producer ITB was delivered to Occidental on June 9, 1981, and thereafter made one successful trip to the Soviet Union. However, on its second trip to the Soviet Union—in September

---

[2]The Oxy Producer ITB was a catamaran integrated tug barge vessel. According to Wausau, such vessels are composed of a tug and a barge that are "mated" through an interconnection system. Thus, the Oxy Producer ITB consisted of the Oxy Producer (the tug) and the Oxy 4102 (the barge).

1981—the Oxy Producer ITB ran into rough weather, which caused substantial movement between the Oxy Producer (the tug unit of the vessel) and the Oxy 4102 (the barge unit of the vessel). Ultimately, the movement of the barge unit against the Oxy Producer opened holes in the hulls of the tug and caused it to sink.[3]

C. Events Surrounding the First Lawsuit

Shortly after the Oxy Producer sank, Wausau, on behalf of the American and London Underwriters, began investigating the loss. When the investigation moved too slowly for Occidental, it pressured the underwriters to pay the claim. To avoid jeopardizing any subrogation rights through litigation with the insured, the underwriters decided to pay the claim—but only under a reservation of all policy defenses.

After the underwriters paid the claim under the time hull insurance policy, they and Occidental filed suit against the various parties involved in constructing the Oxy Producer ITB. The underwriters and Occidental argued that Henry was liable for the loss because of its role in preparing the plans and specifications for the vessel. Avondale was liable, the underwriters and Occidental contended, for not following the architectural plans and for using defective bumper pads in constructing the vessel. Because it supplied the allegedly defective bumper pads, Victoria was also named as a defendant. And finally, the underwriters and Occidental sued Hvide for its role in supervising the construction of the Oxy Producer ITB.

On July 23, 1984, almost two years after the sinking of the Oxy Producer, Occidental, the American Underwriters, and Hvide executed a "Standstill Agreement."[4] The general purpose of this agreement is undisputed: it was to allow Occidental, the American Underwriters, and Hvide to present a united front against Henry, Avondale, and Victoria in the already pending lawsuit.[5] The

---

[3]For a more detailed description of the events leading up to the sinking of the Oxy Producer, see *Employers Insurance of Wausau v. Suwannee River Spa Lines, Inc.,* 866 F.2d 752, 756 (5th Cir.), *cert. denied,* 493 U.S. 820, 110 S.Ct. 77, 107 L.Ed.2d 43 (1989).

[4]The London Underwriters were not a party to the Standstill Agreement because they had, by this time, already waived their reservation of policy defenses.

[5]One of the reasons that Occidental wanted to enter into the Standstill Agreement, according to Wausau, is because Occidental previously had agreed to indemnify Hvide for claims arising out

agreement limited the types of claims that would be advanced in the pending action against Henry, Avondale, Victoria, and Hvide. The agreement also discussed the types of claims that could be asserted among the three parties in a subsequent action. The meaning and effect of the agreement on the latter subject, however, is the subject of considerable dispute. *See infra* Part III.

The lawsuit against Henry, Avondale, Victoria, and Hvide finally proceeded to trial in 1986. After a three-month bench trial on the issue of liability, the district court concluded that the sinking of the Oxy Producer was caused solely by improper mating of the vessel and that therefore the vessel was unseaworthy on delivery. The only parties found liable for the improper mating were Avondale and Hvide. The district court found that Avondale was negligent in performing its construction contract[6] and that Avondale had breached the contract and its express warranty of seaworthiness. Hvide, according to the district court, had breached its supervision agreement with Occidental, had breached its warranty that the plans for the vessel would assure its seaworthiness, and finally, had been negligent in supervising the mating of the vessel. Both Henry and Victoria were dismissed from the suit, because the district court found that they were in no way responsible for the improper mating of the vessel.

On appeal of the first lawsuit, we affirmed the district court's holdings that the vessel was improperly mated and unseaworthy on delivery and that this condition alone caused the Oxy Producer to sink. We reversed the district court's dismissal of claims against Henry and Victoria, however, as being premature. Finally, we remanded the case for a determination of damages in a manner consistent with our opinion. *See Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.,* 866 F.2d 752, 755 (5th Cir.), *cert. denied,* 493 U.S. 820, 110 S.Ct. 77, 107 L.Ed.2d 43 (1989).

D. Wausau's Cross–Claim for the Return of Insurance Proceeds

On remand, Wausau filed a cross-claim against Occidental on behalf of the American

---

of Hvide's operation of the vessel. In its brief on appeal Wausau states: "Occidental expressed concern [at the time the Standstill Agreement was executed] that it would, in effect, lose its recovery for the OXY PRODUCER in the event of any negligence of Hvide by operation of the indemnity agreement."

[6]Although the district court found that Avondale had been negligent in performing its construction contract, the court also found that the contract effectively disclaimed tort liability.

Underwriters, seeking recovery of the proceeds paid to Occidental under a reservation of rights. In this cross-claim, Wausau asserted that, because the Oxy Producer ITB was unseaworthy at delivery, Occidental breached the warranty of seaworthiness implied at the inception of the time hull policy. Wausau reasoned that Occidental's breach of the implied warranty of seaworthiness at the inception of risk prevented the time hull policy, under which Occidental had claimed the proceeds, from attaching.

Occidental moved for summary judgment, asserting that there were no genuine issues of material fact and that Wausau's cross-claim was barred as a matter of law. In support of its motion, Occidental advanced numerous arguments. Occidental first argued that the Standstill Agreement between Occidental, Hvide, and Wausau expressly precludes the cross-claim. Occidental also contended that, under a time hull policy like the one issued to Occidental, there is no absolute implied warranty of seaworthiness at the inception of coverage. Occidental further maintained that, even if there is such an absolute warranty implied at the inception of coverage, its particular time hull policy—through the Liner Negligence Clause and the Separate Policy of Insurance Treatment Clause—nonetheless provides coverage for the loss incurred in this case. Occidental finally argued that Wausau and the American Underwriters had waived or are estopped from asserting their right to seek recovery of the insurance proceeds.

The district court agreed with at least three of Occidental's arguments, and therefore granted summary judgment in Occidental's favor. As one ground for granting summary judgment, the district court relied on the "clear and unambiguous" language of the Standstill Agreement, which it held bars Wausau's cross-claim as a matter of law. The district court also held that the Liner Negligence Clause in the insurance policy supported summary judgment in Occidental's favor. In particular, the district court reasoned that the due diligence provision in the Liner Negligence Clause displaces any implied warranty of seaworthiness at the inception of risk. As a third ground for granting summary judgment, the district court cited the Separate Policy of Insurance Treatment Clause in the insurance policy. This clause, in the district court's view, provides an additional basis for coverage of Occidental's loss. Wausau thereafter filed a timely notice of appeal from the district court's order granting summary

judgment in favor of Occidental.

## II. STANDARD AND SCOPE OF REVIEW

In reviewing a summary judgment, we apply the same standard as the district court. *Waltman v. International Paper Co.,* 875 F.2d 468, 474 (5th Cir.1989). We ask specifically whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). In answering the first part of this question, we view all evidence and the inferences to be drawn from the evidence in the light most favorable to the party opposing the motion. *Marshall v. Victoria Transp. Co.,* 603 F.2d 1122, 1123 (5th Cir.1979) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). Questions of law, on the other hand, are subject to de novo review. *Netto v. Amtrak,* 863 F.2d 1210, 1212 (5th Cir.1989).

In our review of a district court's decision to grant a motion for summary judgment, we will affirm that decision if, after examining the entire record, we are convinced that the standard set forth in Federal Rule of Civil Procedure 56(c) has been met. *See id.* Where, as here, the movant for summary judgment advanced several independent arguments in district court in support of its motion for summary judgment, we will affirm if any of those grounds support the district court's decision. Thus, in our review of the district court's grant of summary judgment in favor of Occidental, we are not bound to the grounds articulated by the district court; instead, we may affirm the district court's judgment on other appropriate grounds. *See Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1355 n. 3 (5th Cir.1986) (citing *Davis v. Liberty Mut. Ins. Co.,* 525 F.2d 1204, 1207 (5th Cir.1976)).

## III. EFFECT OF THE STANDSTILL AGREEMENT

One of the grounds relied on by the district court in granting summary judgment is the language of the Standstill Agreement ("SSA"). The district court held that the unambiguous language of the SSA prohibits Wausau's cross-claim against Occidental. Wausau argues that the district court erred in its interpretation of the SSA. In particular, Wausau argues that (a) the SSA permits the

cross-claim as a matter of law, or (b) because the language of the SSA is ambiguous, there is a fact issue about whether the parties intended to allow such a cross-claim. For the following reasons, we agree with Wausau's latter argument and accordingly hold that the district court erred in granting summary judgment on the basis of language in the SSA.

A. Relevant Provisions of the SSA

The SSA, which was executed prior to the first lawsuit, was a three-party agreement between the American Underwriters (who were represented by Wausau), Occidental, and Hvide. The purpose of the agreement, according to the district court, was to allow the parties "to present a united front in the recovery effort against the various defendants in the consolidated actions." Less than a model of clarity, the SSA provides, in paragraphs one through four:

1. This Agreement shall not apply to any cause of action currently being asserted by the [American] Underwriters, London Underwriters and/or [Occidental] against HVIDE in the consolidated actions referred to above regarding Pre-delivery Acts [7] as presently stated and as the same may be amended; provided, that, such amendments are not inconsistent with this Agreement.

2. For purposes of the Agreement, a "Subsequent Proceeding" is defined as any mechanism or process for the resolution of claims or disputes which is commenced after the consolidated actions have been finally determined, including appeals thereof. [Wausau], [Occidental] and HVIDE agree not to be bound in any Subsequent Proceeding by any finding of fact or decision of law in the consolidated actions which would otherwise be binding upon them under the principles of *res judicata,* collateral estoppel, law of the case or other legal or equitable doctrine with respect to any claims which may be asserted pursuant to paragraph 4 below nor shall such findings of fact or decision of law be admissible for any purpose in any Subsequent Proceeding.

3. The recovery of OXY and the [American] Underwriters and London Underwriters against the defendants in the OXY PRODUCER Action shall be limited to the amounts that may be adjudged recoverable from any or all defendants reduced by any amount HVIDE may be adjudged liable to any co-defendant or plaintiff, by way of contribution or otherwise (a net recovery) arising from any act or failure to act other than a Pre–Delivery Act. In consideration thereof, HVIDE agrees to discontinue without prejudice all the HVIDE Counterclaims; [Occidental] and [Wausau] agree not to assert any additional causes of action in the consolidated actions against HVIDE with respect to the operation of the Vessels; and [Wausau] and [Occidental] agree not to assert any cause of action, except as permitted by paragraph 4 below, against each other with respect to the subject matter of the consolidated actions.

---

[7]The SSA defines "Pre-delivery Acts" as those acts concerning (a) the design and construction of the vessels, (b) the review and approval of technical information, (c) the review and approval of working plans and drawings, (d) the review and inspection of construction of the vessels and their components, and (e) the preparation of the vessels for operation.

4. In the event that the United States Court in the OXY PRODUCER Action finally determines, including appeals, that there was a want of due diligence of HVIDE as manager of the vessel OXY PRODUCER/OXY 4102 under the so-called Liner Negligence clause of the aforementioned policies and that the recovery of the [American] Underwriters is reduced by an amount exceeding 20% of the amounts covered and paid under said Hull and Machinery and Increased Value policies on account of said want of due diligence ("Failure of Due Diligence Holding"), then [Wausau] may, on behalf of said [American] Underwriters, seek the recovery in a Subsequent Proceeding of any amounts not recovered on account of said want of due diligence. If no such Failure of Due Diligence Holding is finally made by the Court then no Subsequent Proceeding shall be instituted or permitted by the United States Underwriters. Each party hereto agrees, subject to paragraph 2 above and to this paragraph 4, that in any Subsequent Proceeding all substantive or procedural rights, remedies, claims or defenses they may have as of the date hereof may be asserted, except that each agrees that any defense of any applicable statute of limitations will be tolled with respect to such rights, remedies, claims or defenses and each agrees to hereby waive any defense of laches or other legal or equitable defense based on the lapse of time.

Except as may be limited hereby, it is the intent that the parties hereto shall be left free to pursue in a Subsequent Proceeding wheatever [sic] rights they may have as of the date hereof.

B. Parties' Interpretations of the SSA

Not surprisingly, Occidental and Wausau offer different interpretations of the SSA. Occidental, citing the last sentence in paragraph three and the first two sentences in paragraph four, interprets the SSA as a broad waiver of the underwriters' prior reservation of rights. Wausau, on the other hand, focusing on the entire SSA, reads the agreement as a "broad reservation of rights which expressly permits the American Underwriters to assert all policy defenses, including breach of the implied warranty of seaworthiness at the inception of the risk." Occidental and Wausau disagree specifically about the meaning of paragraphs three and four of the SSA.

1. *Occidental's "Broad Waiver" Interpretation*

Occidental argues that, under the unambiguous language of the SSA, every "cause of action not specifically reserved therein" was effectively waived. Occidental then points to the fact that Wausau and the American Underwriters did not specifically reserve their right to bring a cross-claim against Occidental for breach of the implied warranty of seaworthiness at the inception of the policy. Occidental therefore reasons that they waived that right by executing the SSA.

In support of its interpretation that the SSA constituted a broad waiver of claims not specifically reserved in the agreement, Occidental primarily relies on language in paragraphs three and four. The significant language in paragraph three, in Occidental's view, is the last clause, which reads:

"[Wausau] and [Occidental] agree not to assert *any* cause of action, *except as permitted by paragraph 4 below,* against each other with respect to the subject matter of the consolidated actions." Occidental argues that this language clearly indicates that paragraph four is an exception to a broad waiver of claims by Wausau and the American Underwriters. The crucial language in paragraph four, Occidental contends, is contained in the first two sentences. The first sentence of paragraph four specifically allows Wausau and the American Underwriters to bring a claim against Occidental if there is a "Failure of Due Diligence Holding"—i.e., if (i) Hvide is found negligent in managing the Oxy Producer ITB and (ii) because of Hvide's post-delivery negligence, the American Underwriters could not recover at least 80% of the money they had paid in settlement of the claim. The second sentence of paragraph four states that "[i]f no such Failure of Due Diligence Holding is finally made by the Court then no Subsequent Proceeding shall be instituted or permitted by the [American] Underwriters." These two sentences in paragraph four, according to Occidental, evince a waiver of any right held by Wausau and the other American Underwriters to bring a claim for breach of the implied warranty of seaworthiness.

Occidental also relies on paragraph one of the SSA to support its waiver interpretation. In that paragraph, Occidental argues, Wausau and the American Underwriters specifically reserved the right to proceed against Hvide for pre-delivery acts. Because Wausau and the American Underwriters did not make a similar reservation with regard to their right to proceed against Occidental for pre-delivery acts, the argument goes, the SSA demonstrates that Wausau and the American Underwriters intended to waive that right.

2. *Wausau's "Broad Reservation" Interpretation*

Wausau interprets the SSA as an agreement in which it and the other American Underwriters made a broad reservation of rights. Paragraphs three and four, Wausau argues, do not constitute a broad waiver of rights, but a narrow exception to the American Underwriters' broad reservation of rights. Wausau further contends that, because the narrow waiver in those paragraphs was not triggered by a "Failure of Due Diligence Holding," those paragraphs have no bearing on the right of the American Underwriters to bring this cross-claim. In short, Wausau views the SSA as expressly

permitting the cross-claim against Occidental.

Wausau first relies on the language of the SSA to support its "broad reservation" interpretation of the SSA. Wausau points specifically to the last two sentences in paragraph four of the agreement. The penultimate sentence in paragraph four reads as follows:

> Each party hereto agrees, subject to paragraph 2 above and to this paragraph 4, that in any Subsequent Proceeding all substantive or procedural rights, remedies, claims or defenses they may have as of the date hereof may be asserted, except that each agrees that any defense of any applicable statute of limitations will be tolled with respect to such rights, remedies, claims or defenses and each agrees to hereby waive any defense of laches or other legal or equitable defense based upon the lapse of time.

Wausau argues that if Occidental's interpretation prevails, the sentence just quoted is rendered meaningless. In its brief, Wausau emphasizes that "[i]f the only substantive basis [the] American Underwriters had to recover the policy proceeds was Hvide's managerial negligence, this savings provision would be absolutely unnecessary." Wausau also points to the last sentence of paragraph four, which provides: "Except as may be limited hereby, it is the intent that the parties hereto shall be left free to pursue in a Subsequent Proceeding wheatever [sic] rights they may have as of the date hereof." The first clause of the sentence, Wausau argues, demonstrates that the parties intended the limitation in paragraph four—the same limitation relied on by Occidental to demonstrate a broad waiver of rights—to be an *exception* to a broad reservation of rights by Wausau and the other American Underwriters.

Wausau also relies on the SSA's broader purpose, which was to maintain a united front among the plaintiffs in the recovery action against Avondale, Henry, Victoria, and Hvide, to support its interpretation of the SSA. According to Wausau, "The united front was created and maintained by requiring the American Underwriters to "stand still' in the prosecution of policy defenses that would blunt or undermine the recovery action." Wausau further maintains that "it is inconceivable that an agreement that became known by all parties as "the Standstill Agreement,' could, in fact, be a waiver of all policy defenses by the American Underwriters." Thus, under Wausau's reading of the SSA, because there is no express waiver of the American Underwriters' right to bring this cross-claim, the SSA permits the action as a matter of law.

C. Appropriateness of the District Court's Interpretation of the SSA

The district court, relying on our decision in *Freeman v. Continental Gin Co.,* 381 F.2d 459

(5th Cir.1967),[8] adopted the interpretation of the SSA advanced by Occidental and held that the

---

[8]We note that the district court technically may have applied the wrong law to this contract interpretation question. The case relied on by the district court in its discussion of the SSA—*Freeman v. Continental Gin Co.,* 381 F.2d 459 (5th Cir.1967)—is a diversity case in which Mississippi contract principles governed. The state of Mississippi has no connection to the contract at issue here—a contract which (1) was executed in Louisiana, (2) related to litigation that was pending in federal district court in Louisiana, and (3) is now being construed to bar an insurer's right to recover proceeds paid under a marine insurance policy issued in Florida.

In addition, there is some question as to whether state or federal law should govern the interpretation of the SSA. If the SSA does not implicate maritime concerns, then state law would govern the interpretation question. *See Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). If the SSA is considered a maritime contract, however, its construction would "normally [be] governed by federal rather than state law." *M.O.N.T. Boat Rental Servs. v. Union Oil Co. of Cal.,* 613 F.2d 576, 579 n. 6 (5th Cir.1980) (citing *Halliburton Co. v. Norton Drilling Co.,* 302 F.2d 431 (5th Cir.1962), *cert. denied,* 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052 (1963); *see also Kenney v. Trinidad Corp.,* 349 F.2d 832, 834 (5th Cir.1965) ("It is clear that in an admiralty case the Court is not bound by *Erie* and *Klaxon*"), *cert. denied,* 382 U.S. 1030, 86 S.Ct. 652, 15 L.Ed.2d 542 (1966). *But cf. Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 321, 75 S.Ct. 368, 374, 99 L.Ed. 337 (1955) (recognizing that, although marine insurance contracts are maritime in nature, courts construing such contracts should look to state law where there is no well-established federal rule on the particular point in question).

We need not resolve this choice of law issue on appeal, however, because it has been virtually ignored by the parties. In the district court, Occidental cited numerous federal cases applying state contract principles to argue for its interpretation of the SSA. *See, e.g., Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.,* 617 F.2d 936, 940 (2d Cir.1980) (applying California law); *Howard v. Russell Stover Candies, Inc.,* 649 F.2d 620, 623 (8th Cir.1981) (applying Missouri law). Wausau, in its reply to Occidental's motion for summary judgment, cited 18 COUCH ON INSURANCE 2d § 71:46, to support its interpretation of the SSA. On appeal, Wausau now notes in its brief that "[t]here was some dispute below as to what law should apply," but argues that either New York or Florida law should govern the interpretation of the SSA. Occidental, conversely, cites no law in its briefing on the meaning and effect of the SSA.

We stated in *Kucel v. Walter E. Heller & Co.,* 813 F.2d 67, 74 (5th Cir.1987), that a party has "an obligation to call the applicability of another [forum's] law to the court's attention in time to be properly considered." *But see Empire Life Ins. Co. of Am. v. Valdak Corp.,* 468 F.2d 330, 334 (5th Cir.1972) (raising, sua sponte, the district court's erroneous decision to apply the Uniform Commercial Code before its effective date). In *American Int'l Trading Corp. v. Petroleos Mexicanos,* 835 F.2d 536 (5th Cir.1987), however, we recognized our power to address a choice of law issue for the first time on appeal where manifest injustice would result. *See id.* at 540 (parties are bound by the theory of law they argue in district court absent manifest injustice). Because the choice of law issue was not raised below, and because we find no manifest injustice in refusing to decide the issue on appeal, we decline to address it.

language of that agreement bars Wausau's cross-claim as a matter of law. The district court first found the language in the SSA to be "clear and unambiguous." The district court further found that Wausau and the American Underwriters waived their "right to bring this cross[-]claim unless there was a finding by the court in the liability action that there was a lack of due diligence on the part of HVIDE, as manager of the vessel." Because no such lack of due diligence finding was ever made, the district court reasoned, the cross-claim is barred.

The district court's grant of summary judgment on this ground is premised on the conclusion that the language of the SSA is unambiguous. A conclusion that a contract is ambiguous—as the district court recognized—is a question of law. Thus, we review the district court's determination de novo. *First Nat'l Bank of Jackson v. Pursue Energy Corp.,* 799 F.2d 149, 151 (5th Cir.1986).

In our view, the SSA is not clear and unambiguous. First, it is unclear what the parties intended by the last clause of paragraph three, which states that Wausau and Occidental "agree not to assert any cause of action, except as permitted by paragraph 4 below, against each other *with respect to the subject matter of the consolidated actions.*" (emphasis added). Because the SSA does not define what is meant by "the subject matter of the consolidated actions," we cannot determine whether Wausau and the American Underwriters' cross-claim against Occidental is included within the terms of that clause. Furthermore, although the provisions relied on by Occidental and the district court in paragraph four—when read out of context—appear clear and unambiguous, those provisions are unclear and ambiguous when read in the context of the entire paragraph. If Wausau and the American Underwriters were absolutely precluded from bringing any subsequent action against Occidental absent a finding that Hvide was negligent in its capacity as manager of the vessel, it would have been unnecessary to include the last two sentences of paragraph four. We think that the last two sentences in paragraph four, which speak in terms of a broad reservation of rights, render the meaning of the first two sentences in the paragraph ambiguous.

In sum, we are unable to determine from the language of the SSA what the parties intended by paragraphs three and four. The interpretation advanced by Occidental—that the paragraphs represent a broad waiver of rights with a narrow reservation—is a reasonable one. However, the

interpretation advanced by Wausau—that the paragraphs represent a broad reservation of rights with a narrow waiver—is also reasonable. There is a fact issue concerning the parties' intent. Accordingly, the district court erred in granting summary judgment in favor of Occidental on the basis of the SSA.

## IV. IMPLIED WARRANTY OF SEAWORTHINESS AT THE INCEPTION OF A TIME POLICY

On appeal—as an independent basis for affirming the district court's summary judgment—Occidental contends that, under the undisputed facts, it did not breach any warranty of seaworthiness implied at the inception of a time hull policy. Occidental argues specifically that "the only implied warranty relating to seaworthiness under a time hull policy, is that the insured will not knowingly send the vessel to sea in an unseaworthy condition." Because there was no finding in the first litigation that it knowingly sent the vessel to sea in an unseaworthy condition, Occidental reasons, Wausau's cross-claim is barred.

The district court did not expressly grant summary judgment for Occidental on this ground, but it did conclude "that a breach of the warranty of seaworthiness at the inception of an insurance policy will void the policy only if the shipowner has prior knowledge of the unseaworthy condition." In reaching this conclusion, the district court recognized that several decisions of this court purported to embrace an *absolute* warranty of seaworthiness in a time hull policy at the moment of attachment. The district court nonetheless reasoned that such cases were inapplicable.

We think that the district court misperceives our prior decisions. As discussed below, federal maritime law[9] implies two warranties of seaworthiness in a time hull insurance policy. The first of these warranties—the implied warranty of seaworthiness at the inception of the policy—is absolute in nature. The second one, which applies only after the policy attaches, is a modified, negative

---

[9]Our decision in *D.J. McDuffie, Inc. v. Old Reliable Fire Ins. Co.,* 608 F.2d 145, 147 n. 1 (5th Cir.1979), *cert. denied,* 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980), indicates that federal law governs questions concerning the warranties of seaworthiness implied in time hull insurance policies. *But see also* Russell W. Pritchett, *The Implied Warranty of Seaworthiness in Time Policies: The American View,* 1983 LLOYD'S MAR. & COM.L. 195, 208 n. 88 (noting that, under *Wilburn Boat Co. v. Fireman's Fund Ins. Co,* 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), "it is arguable that state law should control").

warranty, under which the insured promises not to knowingly send a vessel to sea in an unseaworthy condition. Although the second implied warranty of seaworthiness requires knowledge on the part of the insured, the first does not. The insured breaches this first warranty if the vessel is *in fact* unseaworthy when the policy becomes effective. Accordingly, Occidental is not entitled to summary judgment on the ground that, because it had no knowledge of the vessel's unseaworthiness, it did not breach the warranty of seaworthiness implied at the inception of the time hull policy.

A. Evolution of the Implied Warranties of Seaworthiness in Time Hull Policies

The implied warranties of seaworthiness in time hull policies are unique to American maritime law. *See generally* Russell W. Pritchett, *The Implied Warranty of Seaworthiness in Time Policies: The American View,* 1983 LLOYD'S MAR. & COM.L. 195. According to one commentator, "[t]he present American rule for implied warranties in time policies is a hybrid of the English rules for voyage and time policies." Derek P. Langhauser, Note, *Implied Warranties of Seaworthiness: Applying the Knowing Neglect Standard in Time Hull Insurance Policies,* 39 ME.L.REV. 443, 449 (1987). Thus, before describing the two warranties of seaworthiness implied in time hull policies under the American rule, we examine the sources of those warranties.

1. *Implied Warranty of Seaworthiness in Voyage Policies*

It is well-settled under maritime law in England and America that there is an implied warranty of seaworthiness in "voyage" insurance policies.[10] In *The Caledonia,* 157 U.S. 124, 131, 15 S.Ct. 537, 540, 39 L.Ed. 644 (1895), the Supreme Court stated:

> Every person who proposes to any insurers to insure his ship against sea perils, during a certain voyage, impliedly warrants that his ship is, in every respect, in a suitable condition to proceed and continue on that voyage, and to encounter all common perils and dangers with safety. * * * This warranty is strictly a condition precedent to the obligation of insurance; if it be not performed, the policy does not attach; and, if this condition be broken, at the inception of the risk, in any way whatever and from any cause whatever, there is no contract of insurance, the policy being wholly void.

*Id.* at 131, 15 S.Ct. at 140 (quoting PARSONS, 91 MAR. INS. 367). Similarly in England, section

---

[10]Voyage policies insure a vessel for a single voyage, whatever the duration. Time policies, by contrast, insure a vessel for an unspecified number of voyages during a specified duration. Derek P. Langhauser, Note, *Implied Warranties of Seaworthiness: Applying the Knowing Neglect Standard in Time Hull Insurance Policies,* 39 ME.L.REV. 443, 449 (1987) (citation omitted).

39(1) of the Marine Insurance Act of 1906 provides: "In a voyage policy there is an implied warranty that at the commencement of the voyage the ship shall be seaworthy for the purpose of the particular adventure insured."

The implied warranty of seaworthiness in a voyage policy is absolute in nature. *See* 1 ALEX L. PARKS, THE LAW AND PRACTICE OF MARINE INSURANCE AND AVERAGE 258 (1987) ("The cases are legion establishing that in a voyage policy, the law implies a warranty on the part of the assured which amounts to a positive undertaking—an absolute condition—that the vessel at the commencement of the voyage is seaworthy"). The word "warranty" in this context, according to Professors Gilmore and Black, "has its most drastic meaning." GRANT GILMORE & CHARLES L. BLACK, THE LAW OF ADMIRALTY § 2–6, at 63 (2d ed. 1975). If the implied warranty of seaworthiness in a voyage policy is breached—that is, if "the vessel is not in fact seaworthy at the beginning of the voyage or at the inception of the risk—then no recovery can be had on the policy. This result does not depend on the knowledge or fault of the assured." *Id.* (citing *Richelieu & Ontario Nav. Co. v. Boston Marine Ins. Co.,* 136 U.S. 408, 429, 10 S.Ct. 934, 940, 34 L.Ed. 398 (1890), and *Bullard v. Roger Williams Ins. Co.,* 1 Curt. 148, 4 Fed.Cas. 643 (C.C.D.R.I.1852) (No. 2122)). Nor does this result depend on the subsequent loss being directly attributable to the lack of seaworthiness. *See Gregoire v. Underwriters at Lloyds,* 559 F.Supp. 596, 598 (D.Alaska 1982) (citing GILMORE & BLACK, *supra,* at § 2–6).

The absolute nature of this implied warranty of seaworthiness is grounded in a public policy choice. The warranty is intended to take "away all temptation to expose life and property to the dangers of the seas in vessels not fitted to encounter or avoid them." *The Caledonia,* 157 U.S. at 134, 15 S.Ct. at 541 (quoting the jury charge given in *Bullard v. Insurance Co.*). It is premised on the notion that, because the insured is best able to foresee the nature, extent, and necessities of a specific voyage, the insured is also best able to have the vessel adequately prepared for that voyage. *See* Langhauser, *supra,* at 449 (citing *Hoxie v. Pacific Mut. Ins. Co.,* 89 Mass. (7 Allen) 211, 225 (1863), and *Capen v. Washington Ins. Co.,* 66 Mass. (12 Cush.) 517, 536 (1853)). In short, the absolute warranty implied in every voyage insurance policies represents an early attempt by the law

to place the risk of loss on the cheapest cost avoider. *See also* GILMORE & BLACK, *supra,* § 2–6, at 65 (absolute nature of the implied warranty of seaworthiness in a voyage policy "doubtless had a wholesome effect on the discipline of the shipping industry in early, less well-policed days"); *cf.* GUIDO CALABRESI, THE COSTS OF ACCIDENTS (1970).

2. *Implied Warranty of Seaworthiness in Time Policies—English Rule*

Under English law, there is no implied warranty of seaworthiness in a time policy; however, the insurer can escape liability in certain limited circumstances. Section 39(5) of the Marine Insurance Act of 1906 provides:

> In a time policy there is no implied warranty that the ship shall be seaworthy at any stage of the adventure, but where, with the privity of the assured, the ship is sent to sea in an unseaworthy state, the insurer is not liable for any loss attributable to unseaworthiness.

The English rule regarding time policies can thus be separated into two parts. Under the first part of the rule, there is no absolute warranty that tracks the warranty of seaworthiness in voyage insurance policies. A vessel's condition of unseaworthiness cannot void a time insurance policy. Under the second part of the English rule, however, an insurer may be able to disclaim liability for a particular loss if it can demonstrate that (1) the vessel was unseaworthy, (2) the insured was privy to vessel's condition when it was sent to sea, and (3) the unseaworthy condition proximately caused the particular loss. *See* WILLIAM GOW, MARINE INSURANCE 272 (4th ed. 1909).

The rationale behind the English rule regarding time policies, as embodied in section 39(5) of the Marine Insurance Act of 1906, is somewhat unclear. One commentator views the act as merely declaring the common law and expressing "the gist of a great many decisions." 1 PARKS, *supra,* at 264. Others view the English rule as somehow representing equitable considerations. *See* GOW, *supra,* at 272 (reasoning that, because a time policy could commence when a vessel is at sea—beyond the knowledge and control of her owner—"insistence on the warranty in such a case might become inequitable"); *see also* Pritchett, *supra,* at 197 (tracing English refusal to imply warranty of seaworthiness in time policies to *Gibson v. Small,* 4 H.L.Cas. 352 (1853), a case in which the shipowner obtained a time policy while the vessel was on a voyage). Finally, still another commentator considers section 39(5) of the Marine Insurance Act of 1906 to represent a legislative

compromise between the arguments advanced by shipowners against implying an absolute warranty in time policies and the arguments advanced by insurers in favor of such a warranty. *See* Langhauser, *supra,* at 449–50.

3. *Implied Warranties of Seaworthiness in Time Policies—American Rule*

The American rule regarding the implied warranties of seaworthiness in time insurance policies is set forth in our decision in *Saskatchewan Government Insurance Office v. Spot Pack, Inc.,* 242 F.2d 385 (5th Cir.1957). After describing the English rule regarding the implied warranty of seaworthiness in time hull policies, we stated:

> But the American Rule, in a rare departure from a determined course of parallel uniformity, ... implies for a time policy, as does the English Rule as of the commencement of the voyage for voyage policies, ... a warranty of seaworthiness as of the very moment of attachment of the insurance. And unlike the English Rule which limits the warranty to the commencement of the voyage, the American Rule takes it somewhat further to extend, in point of time, a sort of negative, modified warranty. It is not that the vessel shall continue absolutely to be kept in a seaworthy condition, or even that she be so at the inception of each voyage, or before departure from each port during the policy term. It is, rather, stated in the negative that the Owner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition. And, unlike a breach of a warranty of continuing seaworthiness, express or implied, which voids the policy altogether, the consequence of a violation of this "negative' burden is merely a denial of liability for loss or damage caused proximately by such unseaworthiness.

*Id.* at 388 (citations omitted). In this passage, Judge Brown recognized two implied warranties of seaworthiness in a time policy. The first one—"a warranty of seaworthiness as of the very moment of attachment of the insurance"—is akin to the absolute warranty of seaworthiness implied in voyage policies under the English Rule. The second one, which has been labelled a modified, negative warranty,[11] looks very much like the second part of the English rule regarding the implied warranty of seaworthiness in a time policy. That is, under the second warranty, the insured does not absolutely warrant that the vessel shall continue to be seaworthy for the duration of the policy, but only that he or she, "from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition."

Although we described the American rule in *Spot Pack* as being settled, we recognized that

---

[11]*See, e.g., Lloyd's U.S. Corp. Smallwood,* 719 F.Supp. 1540, 1549 (M.D.Fla.1989), *aff'd,* 903 F.2d 828 (11th Cir.1990).

"[h]ow this came to be the rule of general acceptance for all Time policies is obscure." 242 F.2d at 388. Commentators were also perplexed by the source of the so-called American rule regarding time policies, and our decision in *Spot Pack* was criticized as resting on "quite slender" authority. *See* GILMORE & BLACK, *supra,* § 2–6, at 63; *see also* Pritchett, *supra,* at 196 ("the "American Rule' is not so well established as its name implies"). More recently, a federal district court in Alaska opined that "the great majority of the decided cases in this country are consistent with the English Rule," and accordingly rejected the *Spot Pack* formulation of the American rule. *Gregoire v. Underwriters at Lloyds,* 559 F.Supp. at 600–01.

We are aware of the criticism that has been levelled against our *Spot Pack* decision; however, we decline to revise our interpretation of history. Since our decision in *Spot Pack* we have on several occasions reaffirmed our description of the American rule regarding the implied warranties of seaworthiness in time policies. *See, e.g., Insurance Co. of North Am. v. Board of Comm'rs. of the Port of New Orleans,* 733 F.2d 1161, 1165 (5th Cir.1984); *D.J. McDuffie, Inc. v. Old Reliable Fire Ins. Co.,* 608 F.2d 145, 147 (5th Cir.1979), *cert. denied,* 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980); *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.,* 409 F.2d 974, 983 (5th Cir.1979); *Tropical Marine Prods., Inc. v. Birmingham Fire Ins. Co. of Pa.,* 247 F.2d 116, 119 (5th Cir.1957), *cert. denied,* 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957). In addition, several other circuits have adopted the *Spot Pack* description of the American rule. *See L & L Marine Serv., Inc. v. Insurance Co. of North Am.,* 796 F.2d 1032, 1035 (8th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1000 (1987); *Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.,* 795 F.2d 940, 945 (11th Cir.1986); *see also McAllister Lighterage Line, Inc. v. Insurance Co. of North Am.,* 244 F.2d 867, 870 (2d Cir.1957) (recognizing, under Supreme Court's decision in *Union Ins. Co. of Philadelphia v. Smith,* 124 U.S. 405, 8 S.Ct. 534, 31 L.Ed. 497 (1888), that in a term policy of insurance a warranty of seaworthiness arises at the time when the insurance becomes effective), *cert. denied,* 355 U.S. 872, 78 S.Ct. 123, 2 L.Ed.2d 77 (1957).[12] Finally, we remain convinced that the

---

[12]Several courts, Occidental argues, have rejected our description of the American rule in *Spot Pack.* In *New York, New Haven and Hartford R. Co. v. Gray,* 240 F.2d 460, 466 n. 10 (2d Cir.), *cert. denied,* 353 U.S. 966, 77 S.Ct. 1050, 1 L.Ed.2d 915 (1957), the Second Circuit noted that

general principles described in *Spot Pack* are sufficiently grounded in precedent. *See* Pritchett, *supra,* at 198–208.

B. Nature of the Implied Warranty of Seaworthiness at the Inception of a Time Policy Under the American Rule

This case concerns the precise contours of the first warranty described in our *Spot Pack* decision. There are at least three unresolved questions about the contours of this warranty. First, does the existence of an implied warranty of seaworthiness at the inception of a time hull policy depend on whether the vessel is at port or at sea when the policy attaches? Second, do principles of causation have any role in determining whether a condition of unseaworthiness at the inception of a time policy precludes recovery under the policy? And third, is the implied warranty of seaworthiness at the inception of a time hull policy absolute in nature—such that it is breached if the vessel is *in fact* unseaworthy at the time the policy attaches?

We need only resolve the last question in this case, because the first two questions are not raised. It is undisputed that, when the policy at issue became effective, the Oxy Producer ITB was at a port of repair and not at sea. Moreover, the first lawsuit established that the unseaworthy condition of OXY Producer ITB at the time the policy attached was the sole cause of the loss of the Oxy Producer. Thus, we need only decide whether a breach of the implied warranty of seaworthiness at the inception of a time hull policy requires knowledge or fault on the part of the insured.

We first look to the few cases in which the implied warranty of seaworthiness at the inception of a time policy was at issue.[13] In *Gulfstream Cargo, Ltd. v. Reliance Insurance Co.,* we held that

---

there were statements in American cases to the effect that time policies carry with them an implied warranty of seaworthiness. The Second Circuit in *Gray* nonetheless opined that the language in those cases was dicta. However, shortly after *Gray* was decided, the Second Circuit, in *McAllister Lighterage Line,* embraced the concept of an implied warranty of seaworthiness arising at the inception of a time insurance policy.

[13]In most of the cases discussing the implied warranties of seaworthiness in a time hull policy, it was the negative, modified warranty of seaworthiness that was at issue. *See, e.g., L & L Marine Serv., Inc. v. Insurance Co. of North Am.,* 796 F.2d 1032, 1035 (8th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1000 (1987); *Insurance Co. of North Am. v. Board of Comm'rs of the Port of New Orleans,* 733 F.2d 1161, 1165 (5th Cir.1984); *Tropical Marine Prods., Inc. v. Birmingham Fire Ins. Co. of Pa.,* 247 F.2d 116, 119 (5th Cir.), *cert. denied,* 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957); *Saskatchewan Govt. Ins. Office v. Spot Pack,* 242 F.2d 385, 387 (5th Cir.1957); *Lloyd's U.S. Corp. v. Smallwood,* 719 F.Supp.

the existing, "spectacular" unseaworthiness of the vessel—at the moment the time policy was to attach—kept the policy from becoming effective. 409 F.2d at 983. As Occidental points out, however, this holding does not aid our inquiry, because in *Gulfstream* the insured was charged with knowledge of the vessel's unseaworthy condition. *See id.* at 976. Similar facts surrounded the condition of unseaworthiness in *D.J. McDuffie, Inc. v. Old Reliable Fire Insurance Co.,* a case in which we affirmed the district court's finding that the insured had breached its implied warranty of seaworthiness at the inception of the time policy. 608 F.2d at 147. In *McDuffie,* as in *Gulfstream,* there was evidence that the insured had knowledge of the unseaworthy condition at the inception of the policy. *See McDuffie,* 608 F.2d at 147 ("The [insured's] expert witness testified that one month before the policy was to take effect, he had recommended that [the vessel] be drydocked for critical repairs."); *see also McAllister Lighterage Line v. Insurance Co. of North Am.,* 244 F.2d at 870–71 (holding that unseaworthiness of vessel breached an express as well as the implied warranty of seaworthiness at the inception of time policy). We conclude, therefore, that the cases addressing this warranty do not decide the issue of whether knowledge of the vessel's unseaworthiness or fault on the part of the insured is a prerequisite for finding a breach.

We thus turn to our decision in *Spot Pack* for guidance. There we equated the warranty of seaworthiness implied at the inception of a time hull policy with the warranty of seaworthiness implied in a voyage policy. *See* 242 F.2d at 388. This latter warranty, according to well-settled precedent, is absolute in nature. As stated in *Douglas v. Scougall,* 4 Dow. 269, 270:

> [T]here is nothing in matters of insurance of more importance than the implied warranty that a ship is seaworthy when she sails on the voyage insured.... It is not necessary to inquire whether the owners acted honestly and fairly in the transaction; for it is clear law that, however just and honest the intentions and conduct of the owner may be, *if he is mistaken in fact,* and the vessel is in fact not seaworthy, the underwriter is not liable.

(emphasis added), *quoted in The Caledonia,* 157 U.S. 124, 133–34, 15 S.Ct. 537, 541, 39 L.Ed. 644 (1895). Accordingly, by tracing the implied warranty of seaworthiness at the inception of a time

---

1540, 1549 (M.D.Fla.1989), *aff'd,* 903 F.2d 828 (11th Cir.1990); *Gregoire v. Underwriters at Lloyds,* 559 F.Supp. 596, 599 (D.Alaska 1982); *Lemar Towing, Inc. v. Fireman's Fund Ins. Co.,* 352 F.Supp. 652, 660 (E.D.La.1972), *aff'd,* 471 F.2d 609 (5th Cir.1973), *cert. denied,* 404 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973).

insurance policy to its root—the implied warranty in voyage policies—we conclude that the warranty is absolute in nature, requiring neither knowledge nor fault on the part of the insured.

The sound reasons supporting an absolute, implied warranty of seaworthiness at the inception of a voyage policy also support such a warranty in the context of a time policy—at least where the ship is in a port of repair at the time the policy attaches. It is the insured, not the insurer, who is best able to foresee the intended use of the vessel during the term of a time policy. Consequently, it is the insured, not the insurer, who is in the best position to see that the vessel is adequately prepared for its intended use. Where, as in this case, a time policy attaches while the vessel is in a port of repair, we can discern no reason for relaxing the strict standard embodied in the absolute warranty of seaworthiness implied in a voyage policy. To require knowledge or fault on the part of the insured, in addition to a finding that the vessel was unseaworthy at the inception of the policy,[14] we think, would discourage the owners of vessels from taking steps to assure that the vessel is adequately prepared for its intended use.

In sum, we hold that the warranty of seaworthiness implied at the inception of a time hull policy is absolute in nature. The insurer need not demonstrate that the insured had knowledge of the unseaworthy condition nor that the insured was somehow at fault in not discovering the unseaworthy condition. It is enough to discharge the insurer, as noted in *Scougall,* if "the vessel is in fact not seaworthy" at the inception of the policy. We need not and do not decide, however, whether (a) the absolute warranty arises if the vessel is at sea at the inception of the time policy, or (b) an insurer may claim benefit of the absolute warranty of seaworthiness implied at the inception of the risk if the condition of unseaworthiness does not cause the particular loss.

C. Appropriateness of Summary Judgment on the Basis of Occidental's Compliance with the Implied Warranty of Seaworthiness at the Inception of a Time Policy

The undisputed facts of the case demonstrate that Occidental was not entitled to summary judgment on the ground that it complied with the warranty of seaworthiness at the inception of the

---

[14]We note that it is the insurer who has the burden of demonstrating that the vessel was unseaworthy at the moment the time policy attached. *See Spot Pack,* 242 F.2d at 389. This burden is not insubstantial.

policy. In the first lawsuit, the district court found that the Oxy Producer ITB was improperly mated and unseaworthy on delivery to Occidental. The district court also found that this unseaworthy condition was the sole cause of the sinking of the Oxy Producer. Absent some waiver of the implied warranty of seaworthiness at the inception of the policy, these findings, which were affirmed on appeal, demonstrate as a matter of law that Occidental *did not comply* with this absolute warranty. Summary judgment in favor of Occidental on this ground would be wholly inappropriate.

## V. DISPLACEMENT OF THE IMPLIED WARRANTY OF SEAWORTHINESS AT THE INCEPTION OF A TIME HULL POLICY

Our decision concerning the absolute nature of the implied warranty of seaworthiness at the inception of a time policy does not resolve this dispute, because the district court held that two provisions in Occidental's time hull policy effectively waive or displace that warranty. The district court first concluded that the Liner Negligence Clause of the policy effectively supersedes the warranty. The district court also ruled that the Separate Policy of Insurance Treatment Clause ("Separate Policy Clause") provides coverage for the loss of the Oxy Producer even though Hvide, a co-insured, was found partly responsible for the vessel's unseaworthiness. We address each of these holdings in turn.

### A. Effect of Liner Negligence Clause

Almost every time hull policy now contains an "Inchmaree Clause." This clause affords coverage for certain perils that are not included within the classic "perils" clause. *See generally* 1 ALEX L. PARKS, THE LAW AND PRACTICE OF MARINE INSURANCE AND AVERAGE 363–406 (1987); Francis L. Tetreault, *The Hull Policy: The "Inchmaree" Clause,* 41 TUL.L.REV. 325 (1967). The purpose of such a clause is to broaden the coverage under a marine insurance policy. *Goodman v. Fireman's Fund Ins. Co.,* 600 F.2d 1040, 1042 (5th Cir.1979). Today, a typical Inchmaree Clause covers loss of or damage to the vessel caused directly by latent defects in the machinery or hull or by operational negligence on the part of certain individuals.[15]

---

[15]The latest American version of the Inchmaree Clause provides coverage for (a) accidents in loading, discharging or handling cargo, or in bunkering; (b) accidents in going on or off, or while on drydocks, graving docks, ways, gridirons or pontoons; (c) explosions on shipboard or elsewhere; (d) breakdown of motor generators or other electrical machinery and electrical

Instead of an Inchmaree Clause, the insurance policy issued to Occidental contains a Liner Negligence Clause. This latter clause, it is recognized, provides even broader coverage than the standard Inchmaree Clause. *See* 1 PARKS, *supra,* at 403; Tetreault, *supra,* at 334–35. In particular, the Liner Negligence Clause covers the following risks:

> a. Breakdown of motor generators or other electrical connections thereto; a bursting of boilers; breakage of shafts; or any latent defect in the machinery or hull;
>
> b. Loss of or damage to the subject matter insured caused directly by:
>
>> 1. Accidents on shipboard or elsewhere, other than breakdown of or accidents to nuclear installations or reactors on board the insured vessel;
>>
>> 2. *Negligence, error of judgment or incompetence of any person;*
>>
>> excluding under both "a" and "b" above only the cost of repairing, replacing or renewing any part condemned solely as a result of a latent defect, wear and tear, gradual deterioration or fault or error in design or construction;
>
> provided such loss or damage (either as described in said "a" or "b" or both) has not resulted from want of due diligence by the Assured(s), the Owner(s) or Manager(s) of the vessel, or any of them. Masters, mates, engineers, pilots or crew not to be considered as part owners within the meaning of this clause should they hold shares in the vessel.

(emphasis added). According to one commentator, the Liner Negligence Clause "is really a species of an "all risks' policy," under which the underwriter must "prove that the cause of the loss was one which was excluded by the words of the policy." 1 PARKS, *supra,* at 404.

The district court concluded that the Liner Negligence Clause in the policy issued to Occidental "supplants and is a substitute for any implied warranty of seaworthiness" at the inception of the policy. The district court focused specifically on the language which indicates that coverage is provided for loss caused directly by the "negligence, error of judgment or incompetence of *any person; ...* provided such loss ... has not resulted from want of due diligence by the Assured(s), the Owner(s), or Manager(s) of the vessel, or any of them." This provision, the district court reasoned,

---

connections thereto, bursting of boilers, breakage or shafts, or any latent defect in the machinery or hull (excluding the cost and expense of replacing or repairing the defective part); (e) breakdown of or accidents to nuclear installations or reactors not on board the insured vessel; (f) contact with aircraft, rickets or similar missiles, or with any land conveyance; (g) negligence of charterers and/or repairers, provided such charterers and/or repairers are not an assured hereunder; (h) negligence of masters, officers, crew or pilots, provided such loss or damage has not resulted from want of due diligence by the assured, the owners or managers of the vessels, or any of them.

effectively underwrites the pre-attachment negligence and/or error of judgment by Hvide and Avondale that rendered the Oxy Producer ITB unseaworthy.

Wausau argues that, because Occidental breached the absolute warranty of seaworthiness implied at the inception of a time policy, the policy is void and the question of coverage under the Liner Negligence Clause need not be reached. In support of its argument, Wausau cites two cases: *D.J. McDuffie, Inc. v. Old Reliable Fire Insurance Co.,* 1979 AMC 595 (E.D.La.1977), *aff'd,* 608 F.2d 145 (5th Cir.1979), *cert. denied,* 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980), and *The Natalie,* 1959 AMC 2379 (arbitration). According to Wausau, these two cases demonstrate that, once the insured breaches its implied warranty of seaworthiness at the inception of the policy, recovery is precluded despite the presence of a clause in the policy expanding coverage.

Although Wausau's argument has some logic, it ultimately must be rejected. If we were to adopt Wausau's reasoning, the insured would effectively be precluded from disclaiming this absolute implied warranty of seaworthiness in the policy itself. We decline to adopt such a drastic rule. Moreover, *McDuffie* and *The Natalie* are distinguishable from this case because the policies at issue in those cases contained only Inchmaree Clauses—not Liner Negligence Clauses. At the most, those cases stand only for the proposition that an Inchmaree Clause does not effect an across the board waiver of the implied warranty of seaworthiness at the inception of a time hull policy.

Thus, in deciding whether the district court erred in construing the Liner Negligence Clause, we must answer a difficult question: Does the Liner Negligence Clause, at least with respect to pre-attachment negligence or error in judgment by parties involved in the construction of the vessel, effectively supplant or waive the absolute implied warranty of seaworthiness at the inception of a time hull policy? This question, although it has received some attention from commentators, has not yet been squarely addressed by any court. We therefore proceed with caution.[16]

Although we have indicated that the implied warranties of seaworthiness in a time hull policy

---

[16]The parties have assumed that federal maritime law governs this question. Therefore, we assume, without deciding, that federal law controls. *See Albany Ins. Co. v. Anh Thi Kieu,* 927 F.2d 882, 886–87 (5th Cir.) (describing three-part test used to determine whether, under *Wilburn Boat,* state or federal law governs an issue regarding the interpretation of marine insurance), *cert. denied,* ––– U.S. ––––, 112 S.Ct. 279, 116 L.Ed.2d 230 (1991).

may be disclaimed or waived, we have never specified exactly how such a waiver may be accomplished. Language in *Insurance Co. of North America v. Board of Commissioners of the Port of New Orleans,* 733 F.2d 1161 (5th Cir.1984), suggests that the warranties must be expressly waived. *Id.* at 1165 ("A warranty of seaworthiness by the owner is implied in every hull insurance policy *unless expressly waived* ") (emphasis added). In *Tropical Marine Products, Inc. v. Birmingham Fire Insurance Co. of Pennsylvania,* 247 F.2d 116 (5th Cir.), *cert. denied,* 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957), however, we recognized that an Inchmaree Clause—which does not expressly mention any implied warranties of seaworthiness—"affords both an additional series of perils insured against and *markedly affects the warranties of seaworthiness between Shipowner and Underwriter.*" 247 F.2d at 119.

We think that the common sense approach embodied in *Tropical Marine* is the correct one. In that case, the insurer argued that the vessel's unseaworthy condition arising after a time policy had attached voided the policy. We rejected the insurer's argument primarily on the basis of language in the Inchmaree Clause. The plain language of the clause, we observed, provided coverage for the loss that had resulted from the vessel's unseaworthy condition. We stated:

> Indeed, far from voiding the policy, it was as to just such unseaworthiness that the policy was meant to apply. An Inchmaree clause insures against damage or loss occasioned by latent defects in machinery or hull. Of course, a defect in machinery or a defect in a hull means that the vessel is thereby unseaworthy since, with such defect, the machinery or hull cannot comply with the classic definition of "reasonably suitable' for the purposes intended.... The only limitation on this is that the defect be latent and one not known or discoverable by the owner or one in privy with him.

247 F.2d at 120–21. Therefore, in determining the extent to which a clause in a time hull policy supersedes or waives an implied warranty of seaworthiness, a court should look to the language of the provision to see if it unambiguously covers risks which would ordinarily be excluded by a breach of the implied warranty of seaworthiness. If the clause does cover such a risk, then it may be said that the clause underwrites that particular type of unseaworthiness. *See id.* at 123.

A careful reading of the Liner Negligence Clause in the policy issued to Occidental demonstrates that it effected at least a partial waiver of the absolute warranty of seaworthiness implied at the inception of the policy. The language of the clause is clear and unambiguous: it

provides coverage for loss caused by the "[n]egligence, error of judgment or incompetence of *any* person." (emphasis added). This provision, unlike the negligence provisions in the Inchmaree Clause, does not limit coverage to operational negligence. Instead, it is worded broadly enough to include the negligence of shipbuilders and the construction manager. *See* 1 PARKS, *supra,* at 406 (subparagraph (b) of the standard Liner Negligence Clause covers the negligence of a "builder, and is not limited to masters, crew, engineers, pilots, and repairers or charterers as in the ordinary Inchmaree Clause"); LESLIE J. BUGLASS, MARINE INSURANCE AND GENERAL AVERAGE IN THE UNITED STATES 139 (2d ed. 1981) (negligence of builders is covered under the Liner Negligence Clause but not under the Inchmaree Clause).

The only limit to the partial waiver of the implied warranty of seaworthiness at the inception of the risk under the Liner Negligence Clause is that the loss must not have resulted from a "want of due diligence by the Assured(s), the Owner(s), or Manager(s) of the vessel." Under the Separate Policy of Insurance Treatment Clause, *see infra* Part V.B., Occidental is treated as the only "assured" under the due diligence portion of the Liner Negligence Clause. Therefore, to come within the protection of the Liner Negligence Clause, the loss in this case must not have resulted from a want of due diligence by Occidental, in its role as assured or owner, or from a want of due diligence by Hvide in its role as manager of the vessel.

In our view, the undisputed facts demonstrate that the loss of the Oxy Producer was not caused by any lack of due diligence on the part of Occidental in its status as assured/owner, nor by any lack of due diligence on the part of Hvide as manager of the vessel. In the first lawsuit, it was determined that the actions of Hvide, as construction supervisor, and Avondale, as the builder of the vessel, were the *sole* cause of the loss. *See Employers Ins. of Wausau v. Suwanee River Spa Lines, Inc.,* 866 F.2d at 773. There is no contention by Wausau that Occidental itself was somehow responsible for the vessel's unseaworthy condition. In addition, contrary to Wausau's argument, Hvide's want of due diligence as construction supervisor cannot, as a matter of law, be imputed to Occidental, because Hvide was not an agent of Occidental's, but instead an independent contractor. *See id.* at 773–74 (concluding that Hvide, in its role as construction supervisor, had no actual or

apparent authority to bind Occidental). Finally, we decline to impute Hvide's lack of due diligence as construction supervisor to Hvide as manager. Therefore, the due diligence portion of the Liner Negligence Clause does not exclude the type of unseaworthiness at issue here.

In sum, we hold that the district court correctly granted summary judgment in favor of Occidental on the basis of the Liner Negligence Clause. The plain language of that clause effectively underwrites the unseaworthiness that caused the sinking of the Oxy Producer. In essence, it covers loss caused by the negligence of any person other than the insured, the owner, or the manager of the vessel. For purposes of this case, it is broad enough to cover the negligence of Hvide as the construction supervisor and the negligence of Avondale as the ship builder. At least to this extent, then, the Liner Negligence Clause waives or displaces the absolute warranty of seaworthiness implied at the inception of a time policy.

B. Effect of Separate Policy of Insurance Treatment Clause

The district court also granted summary judgment on the basis of the Separate Policy of Insurance Treatment Clause, under which "all terms, conditions, and exclusions [are] treated as if a separate policy of insurance were issued to each assured." This clause, the district court reasoned, prevents the negligence of Hvide in supervising the mating of the vessel from being imputed to Occidental. The district court accordingly concluded that the Separate Policy Clause independently provides Occidental with coverage for the loss of the Oxy Producer.

We hold that the district court erred in granting summary judgment solely on the basis of the Separate Policy Clause. This clause, unlike the Liner Negligence Clause, does not displace or waive the implied warranty of seaworthiness at the inception of the risk. Instead, as Wausau points out, the Separate Policy Clause "requires *each assured* to comply with policy requirements "as if a separate policy of insurance were issued' to that assured individually." Thus, under Occidental's hypothetical separate time hull policy, it would have been required—but for the Liner Negligence Clause—to independently comply with the absolute warranty of seaworthiness implied at the moment the policy attached. The Separate Policy Clause, while it affected the operation of the Liner Negligence Clause, by itself neither displaced nor changed the terms of the implied warranty of seaworthiness at the

inception of the policy.

## VI. WAIVER AND ESTOPPEL

As additional grounds supporting the district court's grant of summary judgment, Occidental argues that Wausau and the American Underwriters have waived or are estopped to assert this cross-claim. Occidental argues specifically that, by voluntarily paying the loss after they had adequate time to investigate the circumstances surrounding the loss, Wausau and the American Underwriters waived their right to assert policy defenses. In addition, Occidental argues that, due to their conduct in the first lawsuit, Wausau and the American Underwriters are estopped from now asserting their cross-claim.

Summary judgment on the waiver and estoppel theories advanced by Occidental is not appropriate. With regard to Occidental's waiver theory, the undisputed facts demonstrate that Wausau and the American Underwriters did not "voluntarily" pay the loss, but instead paid under a reservation of rights. Moreover, with regard to the estoppel argument, there are clearly fact issues regarding Occidental's alleged reliance on representations and/or conduct by Wausau and the American Underwriters.

## VII. CONCLUSION

The district court did not err in granting summary judgment in favor of Occidental. Although Occidental is not entitled to summary judgment on the ground that (a) the Standstill Agreement precludes the cross-claim, (b) it complied with the absolute implied warranty of seaworthiness at the inception of the time hull policy, (c) the loss was covered under the Separate Policy of Insurance Treatment Clause in the policy, or (d) Wausau and the American Underwriters waived or are estopped to assert this cross-claim, Occidental is entitled to summary judgment on the basis of the Liner Negligence Clause. Therefore, we AFFIRM the judgment of the district court in favor of Occidental.