CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY 200–451–8464, Plaintiffs

v.

Arthur W. JOHNSTON and Annie J. Johnston, Defendants

Arthur W. Johnston and Annie J. Johnston, Counterclaimants

v.

Certain Underwriters at Lloyd's, London subscribing to Policy 200–451–8464, Counterdefendants

No. CIV.96–1968CCCJAC.

United States District Court, D. Puerto Rico.

March 15, 1999.

Jose G. Baquero–Tirado, Calvesbert & Baquero, Miramar, PR, for counterclaim and defendants.

Paul E. Calvesbert–Borgos, Calvesbert & Baquero, Miramar, PR, for counterclaimants and defendants.

Steven E. Goldman, Goldman & Hellman, PA, Fort Lauderdale, FL, for counterdefendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

CASTELLANOS, United States Magistrate Judge.

THIS CAUSE came on for trial on February 16th and February 17th, 1999. The

arguments of counsel, the evidence presented, and the testimony of the witnesses have been carefully considered.

The Court has jurisdiction over this cause pursuant to 28 U.S.C. sec. 1333 admiralty jurisdiction, the action having been commenced by the Plaintiffs' filing of a Complaint for Declaratory Judgment under 28 U.S.C. sec. 2201 et *seq* and Rule 9(h) of the Federal Rules of Civil Procedure.

In the Second Amended Complaint, Plaintiffs ask the Court to rule that their policy of marine insurance issued to the Defendants is void for material misrepresentation. Plaintiffs further ask the Court to rule that their policy of marine insurance either excludes coverage for the damage alleged to have been sustained by Defendants' vessel, or that the Defendants' failure to maintain their vessel in seaworthy condition obviates the policy's coverage. Lastly, Plaintiffs' pleading seeks relief on the basis of the Defendants' alleged failure to mitigate damages.

Defendants counterclaim for the insured value of their vessel, and seek additional costs and attorneys fees incurred due to the alleged wrongful denial of their insurance claim.

For the reasons that follow, the Court finds that Plaintiffs are entitled to judgment voiding coverage under their policy, and to a dismissal of Defendants' counterclaim.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Prior to July 1, 1994, Mr. and Mrs. Johnston were seeking insurance coverage for their vessel, a 41 foot sailboat that they had originally purchased in either 1982 or 1983 when they operated a commercial yacht chartering business in the Florida Keys. The Johnstons had sold the business in 1987 and had retired to the island of Culebra, just off the east coast of Puerto Rico. They purchased a home on Culebra and kept the "Southern Comfort" anchored there in Ensenada Bay. The insurance that they had in effect on the vessel up until July 1994 needed to be replaced since the insurance company was no longer going to offer coverage to risks located in the Caribbean.

The Johnstons approached Mr. Stan Hubbell of American Marine Insurance Services, (AMIS) a marine insurance broker in California, in order to obtain substitute coverage for their vessel. An application was completed and was forwarded by Hubbell to another broker, located near Atlanta, Georgia. This second broker was Janet Schaeffer of Schaeffer & Associates, a surplus lines broker known to have access to marine insurance companies and markets through which coverage could be obtained for vessels in the Caribbean area.

On June 9, 1994, Schaeffer sent the Johnstons' application (and a rating sheet showing the underwriter what the premium would be) to T.L. Dallas & Co. Ltd., an underwriting agent located in the United Kingdom. Operating as a surplus lines broker, Schaeffer had been producing business for the T.L. Dallas facility for several years, and based upon the relationship that had developed, Schaeffer had been provided by T.L. Dallas with rating guidelines and information that permitted her to respond quickly to inquiries such as the one received from Hubbell concerning the Johnstons. With information describing the relevant parameters of the insurance program offered by T.L. Dallas, Schaeffer was able to indicate to brokers such as Hubbell what the prospective terms of the insurance obtainable from T.L. Dallas might be. This sped the process of obtaining coverage by limiting the number of unsuitable or unqualified applications that Schaeffer would submit to T.L. Dallas for evaluation and quotation.

According to the testimony presented at trial by Mr. B.A. Usher, the director of the

T.L. Dallas North American pleasure boat insurance program, Dallas did not allow Schaeffer (and the other surplus lines brokers through which its business was produced) the authority to actually bind the marine insurance company on any risk. Such authority to bind remained the province and the possession of T.L. Dallas.

T.L. Dallas responded to Schaeffer's submission of the Johnstons' application and rating sheet with a quote for coverage from the Anglo–American Insurance Company, the latter being the marine insurer for which Dallas was acting as underwriting and claims agent at that time. Because of the age of the vessel, the quote was conditioned upon Dallas' receipt of a Condition & Valuation survey and a document from the Johnstons confirming that all recommendations made by the surveyor with regard to the vessel's seaworthiness had been complied with.

Through the brokers, the Johnstons were advised of the quote and the conditions for coverage, and their brokers were able to obtain from T.L. Dallas confirmation that coverage was therefore bound for the "Southern Comfort" subject to receipt of the required documentation. On June 14, 1994, Schaeffer advised T.L. Dallas that the Johnstons wished to bind coverage, effective beginning July 1, 1994, on the terms that had been indicated. Schaeffer's June 14, 1994 communication to T.L. Dallas stated that a survey of the vessel was actually "in the mail to me." Schaeffer then received later that same date from T.L. Dallas a confirmation that coverage had been bound.

Mrs. Johnston contacted Capt. Edwin Geary of Geary Associates, a marine surveyor in Puerto Rico, and arranged for the vessel to be surveyed in Fajardo, at Isleta Marina. Capt. Geary conducted the survey on July 15, 1994 and then issued his report dated July 18, 1994 which he provided directly to Mr. and Mrs. Johnston. The Geary survey report found the "Southern Comfort" to generally be in "a distressed and neglected state." In his survey report, Geary compiled a list of fifteen (15) separate items that he deemed to affect the vessel's seaworthiness, recommending that these problems be repaired or in some manner attended to in order to ensure that the vessel was seaworthy. According to the Geary report, and also according to his testimony at trial, only after each and every one of these items had been addressed and remedied could the vessel be considered seaworthy. Additionally, Geary stated in his report and again in his testimony, that the vessel would only have the $78,000.00 value that the Johnstons sought to ensure it for after the completion of every one of the fifteen (15) items set forth as a result of his July 15, 1994 survey of the "Southern Comfort."

Geary also took a number of photographs that were appended to his report, which confirm his findings as to the vessel's general condition at the time of the July 15, 1994 inspection.

Both Mr. and Mrs. Johnston testified at trial that they were very upset with the content of Capt. Geary's July 18, 1994 survey report. They testified that they disagreed with a number of the findings and recommendations set forth in the report. However, rather that contacting Capt. Geary in order to discuss the report, or to voice their concerns over those aspects of the report that they disagreed with, the Johnstons sent the report to AMIS along with a handwritten letter stating their disagreements with the findings set forth in the Geary survey. When they were notified by their brokers that the insurance policy was going to be canceled due to their failure to provide evidence of their compliance with Geary's recommendations, the Johnstons submitted to AMIS a document dated October 18, 1994 entitled "Letter of Compliance," which states:

### COMPLIANCE TO SURVEY RECOMMENDATIONS LETTER

BY MY SIGNATURE AS LEGAL (CORPORATE) OWNER OF THE

VESSEL "SOUTHERN COMFORT" I CAN CONFIRM THAT THE RECOMMENDATIONS AS DESCRIBED ON THE ATTACHED SURVEY DATE 7/15/94 AND PERFORMED BY E.S. GEARY HAVE ALL BEEN COMPLIED WITH. ALL ITEMS NOTED AS FINDINGS AND/OR RECOMMENDATIONS PERTAINING TO THE INTEGRITY OF THE HULL AND MACHINERY HAVE BEEN EITHER FIXED, REPAIRED OR REPLACED.

I UNDERSTAND THAT NON-COMPLIANCE WITH ANY RECOMMENDATION ON THIS SURVEY MAY AFFECT MY INSURANCE COVERAGE.

The Compliance to Survey Recommendations Letter bears Mr. Johnston's signature, although at trial Mrs. Johnston testified that she actually signed her husband's name to the document.

AMIS forwarded Geary's July 1994 survey and the Johnstons' objections to the survey on to Schaeffer. The Compliance to Survey Recommendations Letter was not received by Schaeffer until June 15, 1995, however, at which time the Johnstons were seeking to renew the coverage for another year. Despite being in receipt of the Geary survey and the Johnstons letter objecting to Geary's findings, Schaeffer did not cancel the Johnstons' coverage and in fact sent to AMIS a Cover Note and the policy language evidencing the issuance of Anglo–American's policy no. MP000480R–5262.

In June 1995, AMIS asked Schaeffer to renew the Johnstons' coverage for another year, and Schaeffer responded by informing AMIS that the missing Compliance to Survey Recommendations Letter would be required for the renewal. This document was forwarded by AMIS and on June 29, 1995, Schaeffer asked T.L. Dallas to renew the Johnstons' coverage. Mr. Usher testified at trial that T.L. Dallas renewed the coverage without the necessity for a new application, on the basis of the disclosures of material information made with respect to the initial application process.

By June 1995, T.L. Dallas was no longer acting as the underwriting agent for Anglo–American, but had in the meantime begun to act in that same capacity for Certain Underwriters at Lloyd's, London. Therefore, the Johnstons' renewal of hull & machinery coverage was with the said Underwriters subscribing to policy no. 200/451/8464, which policy incepted on July 1, 1995 and terminated on July 1, 1996, affording coverage in the amount of $78,-000.00.

On September 15, 1995, while the Plaintiffs' policy no. 200/451/8464 was in effect, Hurricane Marilyn passed near Puerto Rico, and the Johnstons claimed that "Southern Comfort" suffered a certain amount of damage as a result. This damage consisted of flooding in the vessel's interior, including engine and electrical items, and external damage to the hull alleged to have been caused by flying debris.

Coincidentally, it was Capt. Geary that was appointed by the marine claims manager at T.L. Dallas to survey the Johnstons' vessel and to adjust the loss if possible. Geary's instructions were relayed via Schaeffer's offices, with the initial Loss Notice from the broker indicating that the extent of the damage was thought to be only $10,000.00. Geary contacted the Johnstons and arranged to inspect the vessel at Isleta Marina. The Johnstons arranged for the "Southern Comfort" to be towed to the marina, where Geary inspected her on October 16, 1995.

On November 30, 1995, Geary provided T.L. Dallas with his Preliminary Damage/Casualty Report. Noting that he had inspected the vessel on July 15, 1994, Geary stated that "the vessel has been neglected and in a distressed state since 1994 and was found in a similar condition in October 1995." He noted a number of deficiencies, remarking on the vessel's "generally poor condition from apparent

abandonment and lack of interest from the assured and now flooding." Most importantly, Geary determined that the cause of the ingress of seawater into the vessel's interior was port lights (i.e., windows) which leaked due to missing, broken and badly corroded securing knobs (referred to as "dogs"). He stated that this condition had to have existed for a lengthy period of time and that the vessel was unseaworthy for the previous eighteen (18) months. Geary recommended to Underwriters that the Johnstons' insurance claim be denied due to the pre-existing unseaworthy condition which was the cause of the damage.

Mr. Mark Thomas, the marine claims Manager at T.L. Dallas instructed Geary to inform the Johnstons that their claim was being denied, and over the course of the next several months the Johnstons endeavored to convince the Underwriters to alter their coverage position. However, at no time did the Plaintiffs alter their position as to the lack of coverage, and the denial was adhered to right up until and through trial.

The Johnstons never moved the "Southern Comfort" from Isleta Marina over the course of the next eight (8) months. They retained another surveyor to inspect the vessel in an effort to substantiate their position that the ingress of seawater was due to some external impact, i.e., that some debris flying about during the hurricane struck the vessel and damaged one or more port lights, shearing off the securing dogs and thereby allowing water into the vessel's interior. Mr. Julian Ducat performed a survey of the "Southern Comfort" on February 10, 1996 and in his subsequent report stated that he observed evidence of such an external impact to one of the vessel's port lights. However, despite his mention of this potentially critical factor, and despite his complete awareness of the fact that his clients were involved in a coverage dispute with Underwriters, Mr. Ducat did not take any photographs of any such damage. Neither did the Johnstons in all the months after the passage of the

hurricane take a single photograph that evidences an external impact to a port light that would allow for the type of internal breakage of the securing dogs that the Defendants contend was responsible for the ingress of seawater.

During the time that the vessel was sitting idle at Isleta Marina, two damage repair estimates were prepared for the Johnstons. Neither estimate takes into account the wording of the Plaintiffs' insurance policy, but merely presents an estimate of the cost of the work necessary to repair all of what is considered to have been the storm damage.

The first estimate was prepared by Caribbean Yacht Care and states that the cost of repairs would be approximately $31,000.00. The second estimate was prepared by Mr. Ducat and states that the total cost of all repairs would be $40,500.00.

T.L. Dallas declined to make its facility available to renew the Johnstons' coverage a second time, and the policy expired on July 1, 1996. The "Southern Comfort" remained at Isleta Marina and at the time of the passage of Hurricane Bertha on July 7, 1996 broke her moorings and became stranded. Underwriters commenced this declaratory judgment action when the Johnstons via their attorney advised that the vessel had sustained further damage during the passage of Hurricane Bertha, and that as a result they were seeking indemnification under policy no. 200/451/8464 for the full $78,000.00 insured value of the vessel.

During the course of investigating the September 15, 1995 damage, Plaintiffs' representatives learned of the existence and of the contents of the Geary survey of July 1994. They also learned for the first time that the Johnstons had taken exception to that survey and to its many recommendations. Via correspondence received from counsel retained by the Johnstons, Underwriters also learned for the first time that despite the execution of the Compliance to Survey Recommendations

Letter signed by Mrs. Johnston, a number of those recommendations had in fact not been complied with either during 1994 when policy no. MP000480R–5262 was in effect, or at the time of the renewal of coverage when policy no. 200/451/8464 was issued by T.L. Dallas.

At the trial, both Mr. Johnston and Mrs. Johnston admitted that there were recommendations that had not been completed, and both testified that they knew this at the time that the Compliance to Survey Recommendations Letter was executed.

Mr. Usher testified that underwriters rely upon the professional expertise and the recommendations of surveyors like Capt. Geary in order to be certain of the condition and the value of the vessels that they have been asked to insure. Mr. Usher's unchallenged testimony was that without the knowledge or belief that a Compliance to Survey Recommendations Letter had been received, and that the representations made therein were completely truthful, he and T.L. Dallas would never have issued the original Anglo–American policy and would never have permitted the subsequent renewal underwritten by Lloyd's.

### CONCLUSIONS OF LAW

#### I. MISREPRESENTATION

■ State law governs marine insurance disputes unless the issue at hand is one of "entrenched federal precedent." *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955). The federal maritime law doctrine of *uberimmae fidei* is recognized as just such well entrenched federal precedent governing the relationship between the underwriter and the insured. *See, In re Balfour MacLaine Intern. Ltd.*, 85 F.3d 68 (2d Cir. 1996); *Certain Underwriters at Lloyd's v. Montford*, 52 F.3d 219 (9th Cir.1995).

A vast host of federal district courts have very recently spoken on this subject and there is near unanimity of agreement that the time-honored doctrine of *uberim-*

*mae fidei*, of the "most perfect good faith," continues to be a correct statement of the law of American marine insurance. *See, Certain Underwriters at Lloyd's v. Giroire*, 27 F.Supp.2d 1306 (S.D.Fla.1998); *Northfield Insurance Co. v. Barlow*, 983 F.Supp. 1376 (N.D.Fla.1997); *Griffith v. American National Fire Ins. Co.*, 1997 A.M.C. 2745 (D.Del.1996); *Atkin v. Smith*, 1996 A.M.C. 2876 (N.D.Cal.1996); *West Africa Trading & Ship. Co. v. London Int'l Group*, 1996 A.M.C.1905 (D.N.J.1996); *Crowley Marine Services, Inc. v. Paul Hunt, et al*, 1995 A.M.C. 2562 (W.D.Wash. 1995); *Albany Ins. Co. v. Horak*, 1993 WL 269620, 1994 A.M.C. 273 (E.D.N.Y.1993); *Chandler v. H.E. Yerkes & Assoc.*, 784 F.Supp. 119 (S.D.N.Y.); *St. Paul Ins. Co. v. Great Lakes Turnings, Ltd.*, 829 F.Supp. 982, 1993 A.M.C. 2539 (N.D.Ill. 1993).

■ There can be no doubt that the doctrine of *uberimmae fidei* applies to the instant case, and there equally can be no doubt that application of the doctrine voids the coverage afforded by Plaintiffs' policy. By their own admissions forthcoming through their sworn testimony at trial, both Mr. and Mrs. Johnston confirmed that they were unwilling to comply with the seaworthiness recommendations set forth in the Geary July 1994 survey, and yet they caused to issue a letter which under the circumstances can only be deemed a fraudulent misrepresentation of material facts, calculated to mislead the underwriter into believing that the repairs had all been made and that the vessel accordingly was seaworthy at the inception of the policy. The underwriter was also misled, as Mr. Usher testified, into wrongly concluding that the Southern Comfort had an insurable value of the $78,000.00 figure that the Johnstons sought to obtain. The Geary survey was quite clear that the "Southern Comfort" could be said to have such a $78,000.00 fair market value *only* if each and every seaworthiness recommendation that he noted was indeed carried out. Since the Johnstons admitted that

they did not do so, and indeed had no intention of doing so, the breach of the duty of the "most perfect good faith" is clear in this instance.

Mr. Usher's testimony was credible and it was also unrebutted. There was simply no evidence presented by the Defendants to contradict Plaintiffs' assertion that material facts were omitted and that material and actually fraudulent misrepresentations were made that resulted in issuance of coverages that would not otherwise have resulted, and in an amount that would never have been the case but for their issuance of the Compliance to Survey Recommendations Letter.

As stated recently by another federal district court:

> Under the federal doctrine of *uberimmae fidei,* marine insurance...is a contract requiring the utmost good faith by both parties to the contract. Often the insurer lacks the practicable means to verify the purposes of establishing the contractual terms. Consequently, the doctrine of *uberimmae fidei* imposes the highest degree of good faith. *Griffith v. American National Fire Ins. Co., supra* at 2755.

The Johnstons had previously operated a yacht chartering business in the Florida Keys, and Mrs. Johnston testified that she was quite familiar with the terms and practices of obtaining marine insurance. She was quite well aware that her issuance of the Compliance to Survey Recommendations Letter would have the intended result of having the far away underwriter issue a policy for a vessel that (according to Geary's July 1994 survey) would have had a value of approximately half of the $78,000.00 policy limits, and that was adjudged by Geary to have required extensive work in order to be placed into seaworthy condition. The Defendants must be said to have failed to meet the standard required under the doctrine of *uberimmae fidei,* and the Plaintiffs are entitled to void their policy. See *Windsor Mount Joy Mutual Insurance Company v. Giragosian,* 57 F.3d 50 (1st Cir.1995).

■ Defendants cannot avoid this result by pointing to the fact that Plaintiff's policy was a renewal of the previous year's policy, and that the original policy was with another company. The original application and its supporting materials were clearly relevant in this instance to Mr. Usher's and T.L. Dallas' June 1995 decision to offer renewal terms through the Lloyd's underwriters. A concealment or misrepresentation in an original application or its supporting documents will void the subsequent coverage even where the renewal is actually with a successor company to the original. *See, Griffith v. American National Fire Ins. Co., supra.* Here, although the underwriters differed from one policy to the next, the underwriting agent remained the same in T.L. Dallas, and Mr. Usher was the individual who made the actual underwriting decision with respect to both polices.

■ Plaintiffs are also entitled to void coverage on the basis of the failure by Schaeffer, the surplus lines broker, to satisfy her obligation to reveal all material information. Schaeffer was in possession of the July 1994 survey performed by Geary, along with the Johnstons' correspondence stating their many objections to his findings and recommendations. Without any Compliance to Survey Recommendations Letter, the broker was therefore in possession of material information which would have resulted in T.L. Dallas voiding the Johnstons' coverage. In the absence of some evidence to suggest deviation from what is the recognized rule in marine insurance, such brokers act as the agents of the insureds when seeking or placing insurance coverage, and failure on the part of the broker to comply with the obligation to disclose all facts material to a risk is imputed to the insured. *Dreiling v. Maciuszek,* 780 F.Supp. 535, 1992 A.M.C. 2482 (N.D.Ill.1991); *Washington International Ins. Co. v. Mellone,* 773 F.Supp. 189, 1991 A.M.C. 996 (C.D.Cal.1990).

Here, the evidence at trial from Mr. Usher was again clear and unrebutted that Schaeffer acts as a classic surplus lines broker, with free access to other facilities and to other insurance markets. Schaeffer is provided with certain information by T.L. Dallas which allows the broker to speed the process of quoting on potential risks, but Dallas is careful to avoid a situation in which the right to accept or reject a risk, and the right to bind the insurer, is vested anywhere other than with itself. Absent some showing that Schaeffer was vested with either actual or ostensible authority, or that Dallas acted in a careless or negligent manner which suggested that Schaeffer was an agent for Plaintiffs, there is no basis for a departure in this case from the rule that holds such brokers to be acting as agents of the insured. *La Reunion Francaise, S.A. v. Barran,* 1998 A.M.C. 2144 (C.D.Cal.1998).

It should be pointed out that the broker's failure to disclose material facts may also have been affected by the Johnstons' assurances that they had eventually carried out every one of Geary's July 1994 recommendations. Although it was not until some eight (8) months after her office had received the survey, Schaeffer was provided with the Compliance to Survey Recommendations Letter and may well herself at that point have reached the conclusion that the vessel was in good condition and was worth the $78,000.00 value for which the Johnstons sought coverage.

Because of the false statements made by the Johnstons in the Compliance to Survey Recommendations Letter, Schaeffer herself was not in possession of the all the material facts concerning the vessel's condition. She could not apprise the Underwriters of facts that were not in her possession, and she was also misled by the deception of the Johnstons.

## II. *UNSEAWORTHINESS*

The Plaintiffs' policy contains an express warranty that the vessel is seaworthy at the inception of coverage. In addition, the American law of marine insurance recognizes an implied warranty of seaworthiness in time policies such as the one at issue. Regardless of which of these warranties one might choose to apply to the "Southern Comfort," the evidence presented at trial strongly supports the Plaintiffs' denial of the Johnstons' claim based upon the clear unseaworthiness of the vessel at virtually every moment in time material to this case.

Plaintiffs' policy states its express warranty of seaworthiness in the following terms:

> It is a condition of this policy that the vessel is seaworthy at the inception of the policy. Violation of this condition will void this policy from its inception.

■ Recent decisions have made it abundantly clear that the foregoing language reiterates as an express warranty the implied warranty of seaworthiness that would otherwise be contained in a time policy. This warranty, whether express or implied, states that an insured's failure to have the vessel in seaworthy condition at the inception of the policy will void coverage precisely as the Plaintiffs' policy asserts. *See, Continental Ins. Co. v. Lone Eagle Shipping, Ltd.,* 952 F.Supp. 1046, 1997 A.M.C. 1099 (S.D.N.Y.1997); *Employers Insurance of Wausau v. Occidental Petroleum,* 978 F.2d 1422, 1993 A.M.C. 1460 (5th Cir.1992), *cert. denied,* 510 U.S. 813, 114 S.Ct. 61, 126 L.Ed.2d 30 (1993).

As stated by the Fifth Circuit in the *Employers Ins. of Wausau* case, in order for the insurer to succeed on the basis of this warranty:

> The insurer need not demonstrate that the insured had knowledge of the unseaworthy condition nor that the insured was somehow at fault in not discovering the unseaworthy condition. It is enough to discharge the insurer...if the vessel is in fact not seaworthy at the inception of the policy. *Employers Ins. of Wausau, supra,* 978 F.2d 1422, 1993 A.M.C. at 1482.

The July 15, 1994 survey conducted by Capt. Geary illustrates that the vessel was unseaworthy at the inception of the first policy, and Geary's subsequent inspection and testimony at trial establishes that the vessel remained in this unseaworthy condition even at the time of the renewal and attachment of the Plaintiffs' policy on July 1, 1995. Plaintiffs' policy was therefore void *ab initio*, and there is no coverage for the September 15, 1995 damage.

Plaintiffs' policy contains additional language which provides that it will not afford coverage where the insured fails to exercise due diligence to maintain the vessel in seaworthy condition. This provision clearly purports to reiterate the so-called "American Rule" which has been recognized as establishing a "negative implied warranty." Under this warranty, "the insured promises not to knowingly send a vessel to sea in unseaworthy condition," *Employers Ins. of Wausau, supra,* 978 F.2d 1422, 1993 A.M.C. at 1474. To find a breach of this provision, the court must determine that the vessel owner had knowledge of the unseaworthy condition. The Fifth Circuit described the effect of this warranty as follows:

> It is not that the vessel shall continue absolutely to be kept in a seaworthy condition, or even that she be so at the inception of each voyage...It is, rather, stated in the negative that the Owner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition. And, unlike a breach of warranty of continuing seaworthiness, express or implied, which voids the policy altogether, the consequences of a violation of this "negative" burden is merely a denial of liability for loss or damage caused proximately by such unseaworthiness. *Saskatchewan Govt. Ins. Office v. Spot Pack, Inc.,* 242 F.2d 385, 1957 A.M.C. 655, at 661; *See also, Ins. Co. of North America v. Board of Comm'rs of the Port of New Orleans,* 733 F.2d 1161, 1985 A.M.C. 1460 (5th Cir.1984).

■ The evidence presented at the trial by Plaintiffs in support of their contention that Defendants breached this warranty was overwhelming. All the witnesses agreed that the seawater that flooded the vessel's interior came in through one or more of the port lights. The testimony of Capt. Geary established that the securing mechanisms on these port lights had been allowed to deteriorate over a period of time that he estimated to be at least one year and possibly longer, and the photographic evidence presented by Geary illustrated the rusted and corroded condition of the securing dogs. This testimony also established to the Court's satisfaction that some number of these securing dogs were almost certainly missing at the time of the passage of Hurricane Marilyn. Defendant's expert, Mr. Ducat, agreed with Geary as to the period of time necessary for this condition to develop, and he also agreed that such a condition rendered the vessel unseaworthy. This Court believes that the Defendants had to have had knowledge of the existence of this unseaworthy condition, which existed over such a long period of time, and that the Defendants were therefore in breach of this negative implied warranty which clearly was causally related to the loss.

There was no evidence presented by Defendants in support of their theory that an external impact broke one or more port lights, thus allowing ingress of seawater. While this was the opinion of Mr. Ducat, his credibility was effectively destroyed by his admission on cross examination that he failed to document his theory with a photograph of any such external damage to any port light. Neither did the Johnstons themselves present this Court with a single piece of evidence to support their theory of an external impact causing a breach of a port light. Capt. Geary's report describing the rusted and corroded condition of the securing dogs was far more persuasive to the Court, and was supported by ample photographic evidence. Defendants' failure to exercise due diligence to

maintain their vessel in seaworthy condition was the cause of the loss, and voids the policy.

### III. LACK OF COVERAGE—THE POLICY LANGUAGE

Even if the Johnstons had acted on every one of Capt. Geary's July 1994 recommendations, and even if the evidence had supported their contention that an external impact to a port light allowed the intrusion of seawater, there would still be no payment due from the Plaintiffs because of the unambiguous language of their policy.

The Defendants' vessel was purchased in 1982 or 1983, and much of the equipment aboard was older than ten (10) years. Plaintiffs' policy excludes from coverage "damage to electrical and/or mechanical equipment including but not restricted to engine, shaft, propeller, rudder...over ten years of age" unless caused by fire, lightening, explosion, etc. Furthermore, the policy excludes damage due to "marring, scratching or denting" of the vessel's exterior.

The unrebutted and uncontroverted testimony of Capt. Geary, based upon his review of the Ducat damage repair estimate, prepared at the request of the Johnstons and introduced into evidence at trial, was that only some $4,000.00 of the repairs would have been covered by the policy. Excluded would have been the lion's share of the estimated repairs, such as $15,000.00 for the engine since it was well in excess of ten (10) years of age, as well as all exterior repair work. Geary's review of the repair estimate prepared by Caribbean Yacht Care resulted in his testifying that none of that approximately $31,000.00 in work would have been covered in so far as the entire estimate was for either engine and electrical damage, or for exterior work to repair marring, scratching and/or denting. Since Ducat admitted under cross examination that the best method of calculating the cost of repairing damage to a vessel was to go to a boatyard and to obtain an estimate from the boatyard, this Court will choose to accept the estimate from Caribbean Yacht Care over that of Mr. Ducat. The unrebutted testimony was that no portion of that repair estimate would have been covered by Plaintiffs' policy.

For the remainder of the issues in this litigation, the Court finds that Plaintiffs can have no liability for the final destruction suffered by the vessel as a result of the passage of Hurricane Bertha on July 7, 1996, after the termination of the Plaintiffs' policy. Mr. Usher testified that T.L. Dallas was uninterested in a second renewal of coverage for the Johnstons once the Geary survey of July 1994 had finally come to light revealing the poor condition of the vessel, and also once it had been determined that the Johnstons had fraudulently misrepresented their compliance with the recommendations set forth in Geary's survey. This Court is unaware of any caselaw to support Defendants' contention that a cause of action exists for an alleged wrongful refusal to renew, and in any event no evidence has been adduced to support any such wrongful refusal to renew. Defendants admitted that Plaintiffs never gave any indication of a reversal of their denial of coverage, and the decision to have the vessel remain at Isleta Marina right up until its destruction in July 1996 was solely that of the Johnstons.

To the extent that any of these Conclusions of Law constitute Findings of Fact, they are hereby adopted as both.

For the reasons set forth, the Court will enter a Final Judgment Order in favor of the Plaintiffs, and dismissing the Defendants' counterclaim.

IT IS SO ORDERED.