[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1126 
St. Paul Fire Marine Insurance Company appeals from the trial court's judgment awarding $293,151.53 to Christiansen Marine, Inc., on Christiansen Marine's action, filed pursuant to §27-23-2, Ala. Code 1975, seeking the proceeds of a marine-insurance policy issued by St. Paul to Dogwood Management Services, Inc. We affirm in part and reverse in part.
 Facts
This dispute arises out of a barge accident that occurred in the Gulf of Mexico. Christiansen Marine is a marine towing company. Dogwood, although now out of business, was a corporation affiliated with Upchurch, Inc.; Upchurch, Inc., was engaged in the lumber and pulpwood business. Dogwood was incorporated for the purpose of hauling woodchips.[1]
In early 1995, Dogwood entered into a contract with Christiansen Marine to tow from Mobile to Williamston, North Carolina, seven hopper barges Dogwood was negotiating to purchase.[2] Dogwood was negotiating the purchase of these barges from a third party; the barges were 20 to 25 years old. As part of the negotiations, Dogwood was arranging financing for the purchase and insurance on the barges.
In March 1995, Dogwood, through one of its principals, Tuck McConnell, hired Perry Beebe, a licensed marine surveyor, to provide a "condition and valuation" survey on the barges it was considering purchasing.[3] Beebe issued surveys on all seven barges; those surveys revealed, by way of Beebe's comments and by way of photographs, that the barges leaked and were in need of repairs.
Beebe's surveys indicated that certain repairs to the barges were "considered compulsory for insurance underwriting purposes." However, after receiving the surveys in draft form, McConnell contacted Beebe and asked if certain of the repairs could be deferred until the next maintenance scheduled for the barges. Beebe agreed that those repairs could be deferred but he advised that certain other repairs be completed immediately. He amended the recommendations section of his surveys to reflect that the repairs listed "should be completed at the next regular *Page 1127 
servicing/maintenance period."[4] Beebe made no other changes to the surveys; the surveys as amended contained all of his comments regarding the condition of the barges in each of his draft surveys. In each draft survey and in each amended survey, Beebe concluded by stating "[i]n the opinion of this undersigned, subject vessel is considered suitable for its intended purpose and a satisfactory risk for interested underwriters. . . . In accepting this report it is understood that this survey was performed for condition and valuation purposes only and that no warranty as to the condition, seaworthiness or marketability of subject vessel is expressed or implied."
In April 1995, Dogwood contacted its insurance broker, Lee Wimberly of Rollins Hudig Hall, regarding Dogwood's need for a marine-insurance policy on the barges. On April 12, 1995, Wimberly had several conversations with Clark Travitz, an underwriter with St. Paul, regarding insurance coverage for Dogwood's seven barges while they made their one-way trip from Mobile to North Carolina and while on their anticipated regular route between Williamston, North Carolina, and Savannah, Georgia. As a result of the April 12 conversations between Wimberly and Travitz, Wimberly provided Travitz a copy of a letter from Dogwood; this letter indicated that "all repairs necessary to make the vessels seaworthy have been performed." Travitz testified that he routinely asked for such a statement from a prospective insured.
As a result of those conversations, Travitz faxed a "quote sheet" to Wimberly on that same date. The quote sheet referenced certain standard coverages — standard hull coverage, Form SP-39C, and protection and indemnity coverage, Form SP-38 — and commented on the other material terms of the insurance being offered.
After receiving the quote sheet from Travitz, Wimberly issued Dogwood a binder of coverage with St. Paul. The binder specifically indicated that the barges were covered for the trip from Mobile to North Carolina. This binder was then faxed to John Christiansen, the principal of Christiansen Marine, to notify him that the barges were insured and that he could depart from Mobile with the barges.
Also on April 12, Wimberly sent Travitz copies of Beebe's amended surveys on the barges. Travitz received these surveys on April 13. According to Travitz's deposition testimony, he reviewed the surveys for the specific purpose of determining the condition of the barges. After receiving and reviewing the surveys, Travitz took no further action regarding the coverage St. Paul issued to Dogwood.
On April 23, 1995, two tugboats belonging to Christiansen Marine left Mobile with the seven barges bound together into a single tow.[5] Approximately four miles *Page 1128 
from the mouth of Mobile Bay in the Gulf of Mexico, the tow of barges broke apart as a result of taking on water.[6] As a result of the breakup and efforts by the crew of Christiansen Marine to gather up the barges, Christiansen Marine incurred various damages. Christiansen Marine sought to recover those damages from Dogwood.
Dogwood reported the incident with the barges to St. Paul, and St. Paul conducted an investigation. However, at the time of the incident St. Paul had not yet issued a formal policy of insurance to Dogwood. St. Paul did not issue the policy of insurance until May 12, 1995, after it had concluded its investigation of the loss. When St. Paul issued a formal "paper" policy, it issued the standard form policies referenced on the quote sheet and the binder;[7] however, St. Paul also included a "Trip Risk Endorsement," which provided:
 "It is in condition of this extention [sic] that the barges are confined to the Intercoastal Waterway of the U.S. (where present) and the Okeechobee Barge Canal, otherwise not to exceed 3 miles off shore. Furthermore, the barges shall be in control of two tugs at all times."
According to Travitz, a marine policy rarely includes a trip-risk endorsement and each trip-risk endorsement is different. Travitz testified that one trip-risk endorsement might limit an insured to no more than 3 miles offshore while another trip-risk endorsement might limit an insured to no more than 12 miles offshore. Travitz agreed that, because there is no standard form for a trip-risk endorsement and because the issuance of such an endorsement is rare, in order for an insured to know the details of a trip-risk endorsement, the insurer must specifically reveal that a trip-risk endorsement will be added to a policy and what the terms of that endorsement will be. St. Paul's quote sheet did not indicate that a trip-risk endorsement would be included in Dogwood's insurance coverage for the barges; the binder issued by Rollins Hudig Hall did not mention a trip-risk endorsement.[8]
On June 2, 1995, St. Paul notified Dogwood that it intended to deny the claim.[9] On June 13, St. Paul filed a declaratory-judgment action against Dogwood in the United States District Court for the Middle District of Florida; St. Paul sought a determination that it owed no coverage for the April 23 incident because the barges *Page 1129 
were unseaworthy, because the trip-risk endorsement contained in the policy was violated when the barges went beyond the three-mile provision, and because the damages did not arise out of a covered peril. St. Paul did not name Christiansen Marine as a party to the declaratory-judgment action.
On September 25, 1995, Dogwood sued Christiansen Marine in the Mobile Circuit Court, claiming damages as a result of the April 23 casualty. Christiansen Marine counterclaimed, asserting a breach-of-contract claim and seeking damages as a result of the April 23 loss.
In 1997, St. Paul and Dogwood entered into a settlement agreement in the declaratory-judgment action; in this settlement agreement, St. Paul agreed to pay Dogwood $25,000 in return for a release of all claims for insurance coverage under the policy.[10] St. Paul and Dogwood then entered into a consent judgment, which was submitted to and approved by the federal district court on May 21, 1997. In the consent judgment, Dogwood acknowledged that at the time of the loss its barges were outside the three-mile navigational limitation stated in the trip-risk endorsement. The parties stipulated that because Dogwood's barges were outside the three-mile limit in the trip-risk endorsement, Dogwood's policy with St. Paul was "null and void at all times relevant, including but not limited to the time of the occurrence on April 23, 1995," as a result of Dogwood's violation of the trip-risk endorsement. As a result of this consent judgment, the district court dismissed, with prejudice, Dogwood's counterclaim seeking coverage under the policy and money damages.
Although St. Paul raised the issue of the seaworthiness of the barges in its complaint for a declaratory judgment, the consent judgment did not address that issue. However, St. Paul included in the consent judgment language that purported to reserve to St. Paul the right to assert "any and all further defenses to coverage under the subject combined policy including any future lawsuit commenced by Dogwood and/or any other third party, including but not limited to Christiansen Marine, Inc." Christiansen Marine was not a party to the declaratory-judgment action, was not a party to the consent judgment, and was not a party to the settlement agreement.
On August 24, 2001 (over four years after the declaratory-judgment action was settled), a jury in Dogwood's action against Christiansen Marine in the Mobile Circuit Court returned a verdict against Dogwood on its claims against Christiansen Marine and in favor of Christiansen Marine on its counterclaim. The jury awarded Christiansen Marine $457,415.79 in damages. In response to special interrogatories submitted to the jury, the jury indicated that Christiansen Marine had not been negligent and that therefore Christiansen Marine's negligence could not have been a proximate cause of Dogwood's damages, and that Dogwood's barges had been unseaworthy as claimed by Christiansen Marine and that that unseaworthiness was a proximate cause of Christiansen Marine's loss. The trial court entered a judgment on the jury's verdict. Dogwood did not appeal, and the judgment for Christiansen Marine and against Dogwood became final. After the expiration of 30 days, the judgment against Dogwood remained unsatisfied.
On November 6, 2001, Christiansen Marine sued St. Paul and Dogwood in the *Page 1130 
Mobile Circuit Court; Christiansen Marine alleged that, pursuant to § 27-23-2, Ala. Code 1975, it was entitled to the proceeds of the St. Paul policy issued to Dogwood in order to satisfy its judgment against Dogwood.
Christiansen Marine's action against St. Paul was assigned to the same judge who presided over Dogwood's action against Christiansen Marine. In its answer to the complaint, St. Paul admitted that it had issued the binder of coverage for the barges, that the binder made no mention of a trip-risk endorsement, and that the formal policy was not issued until after the April 23, 1995, incident. However, St. Paul asserted, among other things, that the policy was void ab initio because the barges were unseaworthy at the inception of the policy; that Christiansen Marine was bound by the consent judgment issued by the federal district court in which Dogwood admitted that it had violated the navigational limits of the policy; that in the settlement agreement Dogwood had released St. Paul from any and all liability under the insurance policy; and that because Christiansen Marine's loss occurred beyond the navigational limits of the St. Paul policy, St. Paul owed no coverage for the damage.[11]
After a bench trial during which the trial court received evidence ore tenus, the trial court entered a judgment in favor of Christiansen Marine and against St. Paul. In its order, the trial court held that St. Paul was obligated to provide coverage to Christiansen Marine for certain of the damage suffered by Christiansen Marine in the April 23 loss. The trial court concluded that, because St. Paul had actual and constructive knowledge of the condition of the barges before the loss occurred, St. Paul was estopped to rely on the unseaworthiness of the barges as a reason for denying coverage; the trial court also concluded that the terms of the policy as negotiated by St. Paul and Dogwood's broker did not include a trip-risk endorsement or a navigational limit. The trial court further determined that Christiansen Marine was not bound by the consent judgment entered by the federal district court because Christiansen Marine was not a party to that declaratory-judgment action;[12] therefore, the judgment entered in that action could not bind Christiansen Marine or prejudice Christiansen Marine's rights. Additionally, the trial court concluded that Dogwood had not withheld material information from St. Paul by failing to provide both versions of Beebe's surveys to St. Paul and therefore that Dogwood had not violated any duty uberrimae fidei (of utmost good faith) to St. Paul. The trial court also heard testimony from St. Paul's director of global marine claims, who acknowledged that, if the policy was not void, certain of the damage Christiansen Marine suffered would be covered by Dogwood's insurance policy. Based on that testimony and on its own reading of the insurance policy,[13] the trial court *Page 1131 
awarded Christiansen Marine $293,151.53 in damages and postjudgment interest.
St. Paul filed a motion to add to or amend the findings of fact and conclusions of law in the judgment, or to alter, amend, or vacate the judgment pursuant to Rules 52(b) and 59(e), Ala. R. Civ. P. The trial court denied those motions.
St. Paul challenges the judgment of the trial court on several grounds:[14]
 "I. Christiansen [Marine] was not entitled to recover because Dogwood's insurance policy was void at its inception due to the unseaworthiness of the barges; the trial court misapplied the law when it held otherwise.
 "A. Under Alabama's `Reach and Apply' Statute, policy defenses available to St. Paul against Dogwood are equally applicable to Christiansen [Marine].
 "B. Unseaworthiness at the inception of a marine insurance policy voids the policy so that it never exists or attaches.
 "C. The barges were unseaworthy at the inception of the insurance policy.
 "D. St. Paul's actual or constructive knowledge of the unseaworthiness of the barges after the policy was bound could not revive the already void policy; the trial court's reliance on Luria Brothers Co., Inc. v. Alliance Assurance Co., Ltd.[, 780 F.2d 1082
(2d Cir. 1986),] in so holding was misplaced.
 "II. Christiansen [Marine] was not entitled to recover because Dogwood breached its duty of uberrimae fidei (utmost good faith) to St. Paul, thereby voiding its insurance policy; the trial court misapplied the law when it held otherwise.
 "A. Under the marine insurance doctrine of uberrimae fidei (utmost good faith), the insured's failure to disclose to the insurer material facts regarding the risk voids the policy.
 "B. Dogwood's failure to inform St. Paul of the changes made to the Beebe surveys, combined with its representations to St. Paul that `all repairs necessary to make the vessels seaworthy have been performed,' violated Dogwood's duty of uberrimae fidei and voided the insurance policy.
 "C. The trial court misapplied the law when it held that Dogwood's failure to inform St. Paul of the changes to the Beebe surveys did not void the policy.
 "III. Even if Dogwood's insurance policy was not void at its inception, some of the damages awarded to Christiansen [Marine] were not covered under the policy's terms; the trial court's findings otherwise were clearly erroneous.
 "IV. The trial court's failure to apply the policy deductible to reduce Christiansen [Marine's] recovery was a misapplication of Alabama Code [1975,] § 27-23-2.
 "V. Christiansen [Marine's] Chapter 7 bankruptcy trustee should be substituted as the real party in interest."[15] *Page 1132 
 Standard of Review
The trial court entered its judgment in this case after a bench trial during which it received oral testimony.[16]
Therefore, the ore tenus rule applies to our review of the trial court's findings of fact. "`Under the ore tenus rule, a trial court's findings of fact are presumed correct and its judgment will be reversed only if plainly or palpably wrong or against the preponderance of the evidence.'" Ex parte Baron Servs., Inc.,874 So.2d 545, 548 (Ala. 2003) (quoting Ex parte Cater,772 So.2d 1117, 1119 (Ala. 2000)).
 "`[U]nder the ore tenus standard of review, the trial court's findings of fact based on oral testimony, and a judgment based on those findings, are given a presumption of correctness. . . . The appellate courts are not allowed to substitute their own judgment for that of the trial court if the trial court's decision is supported by reasonable inferences to be drawn from the evidence. The reason for giving such deference to the trial judge's findings based on disputed evidence in ore tenus proceedings is that the trial judge has the benefit of observing the witnesses' manner and demeanor and has the better opportunity to pass upon the credibility of their testimony.'"
Knight v. Beverly Health Care Bay Manor Health Care Ctr.,820 So.2d 92, 97-98 (Ala. 2001) (quoting Ex parte Pielach,681 So.2d 154, 154-55 (Ala. 1996)).
However, the "`ore tenus rule does not extend to cloak a trial judge's conclusions of law . . . with a presumption of correctness.'" Ex parte Baron Servs., 874 So.2d at 549 (quotingEubanks v. Hale, 752 So.2d 1113, 1144-45 (Ala. 1999)). See alsoKnight, supra.
 Analysis "I. Christiansen [Marine] was not entitled to recover because Dogwood's insurance policy was void at its inception due to the unseaworthiness of the barges; the trial court misapplied the law when it held otherwise."
St. Paul argues that the trial court erroneously concluded that St. Paul owed coverage under the policy. St. Paul argues that the barges were unseaworthy at the inception of the policy and that the unseaworthiness of the barges at that time breached the implied warranty of seaworthiness inherent in every marine policy and voided the policy ab initio, so that the policy never existed or attached. St. Paul argues that the implied warranty of seaworthiness is absolute in nature and because Dogwood's barges were in fact unseaworthy at the time St. Paul purported to issue the policy, the policy was void ab initio.
However, the trial court rejected St. Paul's unseaworthiness defense, finding that St. Paul had actual and constructive knowledge of the condition of the barges on April 13, 1995 — 10 days before the loss occurred — and that if Dogwood's barges were in fact unseaworthy, St. Paul had assumed that risk. St. Paul responds that its actual or constructive knowledge of the unseaworthiness of the barges after the policy was bound could not revive the already void policy.
We find no Alabama caselaw discussing the implied warranty of seaworthiness.[17] St. Paul relies upon cases from the *Page 1133 
United States Court of Appeals for the Fifth Circuit as authority for its position.[18] In Employers Insurance of Wausau v.Occidental Petroleum Corp., 978 F.2d 1422 (5th Cir. 1993),[19] the Fifth Circuit discussed in depth the implied warranty of seaworthiness applicable to a marine hull time policy. The Employers Insurance court noted that the same reasons supporting an absolute, implied warranty of seaworthiness at the inception of a voyage policy also supported an absolute, implied warranty of seaworthiness at the inception of a time policy, at least where the vessel is in a port of repair at the time the policy attaches. Employers Insurance, 978 F.2d at 1436. The Fifth Circuit stated:
 "It is the insured, not the insurer, who is best able to foresee the intended use of the vessel during the term of a time policy. Consequently, it is the insured, not the insurer, who is in the best position to see that the vessel is adequately prepared for its intended use. Where, as in this case, a time policy attaches while the vessel is in a port of repair, we can discern no reason for relaxing the strict standard embodied in the absolute warranty of seaworthiness implied in a voyage policy. To require knowledge or fault on the part of the insured, in addition to a finding that the vessel was unseaworthy at the inception of the policy, we think, would discourage the owners of vessels from taking steps to assure that the vessel is adequately prepared for its intended use.
 "In sum, we hold that the warranty of seaworthiness implied at the inception of a time hull policy is absolute in nature. The insurer need not demonstrate that the insured had knowledge of the unseaworthy condition nor that the insured was somehow at fault in not discovering the unseaworthy condition. It is enough to discharge the insurer, as noted in [Douglas v.] Scougall, [4 Dow. 269, 270,] if `the vessel is in fact not seaworthy' at the inception of the policy. We need not and do not decide, however, whether (a) the absolute warranty arises if the vessel is at sea at the inception of the time policy, or (b) an insurer may claim benefit of the absolute warranty of seaworthiness implied at the inception of the risk if the condition of unseaworthiness does not cause the particular loss."
Employers Ins., 978 F.2d at 1436 (footnote omitted). For these reasons, the Fifth Circuit concluded that the implied warranty of seaworthiness, in the context of a time hull policy, was also absolute in nature and did not depend upon the knowledge or intent of the insured.
However, assuming for the sake of argument that this is the proper statement of the American Rule of the implied warranty of seaworthiness to be applied to a time policy, and we express no opinion as to whether it is, the absolute nature of this warranty does not insulate an insurer from the legal ramifications of its own conduct.[20] *Page 1134 
The trial court, as the trier of fact, determined that St. Paul had knowledge — whether actual or constructive — of the condition of Dogwood's barges before the April 23 loss occurred but that it took no action to revoke its insurance policy until after the loss had occurred. What is a reasonable time in which an insurer must act in order to avoid the acceptance of a risk being considered a waiver of the condition or estoppel is ordinarily a question of fact. See General Ins. Co. of America v. M.S.Killen, 270 Ala. 604, 120 So.2d 887 (1960). In this case, the trier of fact — the trial court — resolved that issue against St. Paul. See Luria Bros. v. Alliance Assurance Co., 780 F.2d 1082
(2d Cir. 1986) (holding that underwriters had either actual or constructive notice that insured had not disclosed unseaworthy condition of vessel when it sought coverage; therefore, underwriters could not subsequently rely on a misrepresentation argument to deny coverage after a loss occurred as a result of vessel's unseaworthiness). The trial court did not clearly err in finding that St. Paul was estopped from relying on the unseaworthiness of the barges as a defense to coverage.
 "II. Christiansen [Marine] was not entitled to recover because Dogwood breached its duty of uberrimae fidei (utmost good faith) to St. Paul, thereby voiding its insurance policy; the trial court misapplied the law when it held otherwise.
 "A. Under the marine insurance doctrine of uberrimae fidei (utmost good faith), the insured's failure to disclose to the insurer material facts regarding the risk voids the policy.
 "B. Dogwood's failure to inform St. Paul of the changes made to the Beebe surveys, combined with its representations to St. Paul that `all repairs necessary to make the vessels seaworthy have been performed,' violated Dogwood's duty of uberrimae fidei and voided the insurance policy.
 "C. The trial court misapplied the law when it held that Dogwood's failure to inform St. Paul of the changes to the Beebe surveys did not void the policy."
St. Paul argues that Christiansen Marine cannot recover because, it argues, Dogwood breached its duty uberrimae fidei, the duty of utmost good faith, owed to St. Paul at the inception of the policy. St. Paul argues that the insurance policy was void at its inception because Dogwood failed to provide material information to St. Paul regarding the condition of the barges it was seeking to insure.
The trial court held that Dogwood did not misrepresent material information by failing to provide St. Paul with the initial draft of Beebe's surveys because, it reasoned, Beebe agreed that certain of the repairs to the barges could wait until the next scheduled maintenance; because both the draft surveys and the final surveys provided the same detailed descriptions of the condition of the barges; because Travitz testified that, upon receiving the surveys, he thoroughly reviewed them to determine the condition of the barges and after having done so, he took no further action; and because there was nothing to prevent St. Paul from inquiring further into the condition of the barges if it felt it needed more information.
Whether the language originally contained in Beebe's surveys was material to St. Paul's decision to insure Dogwood's barges was a question of fact to be determined by the trial court. See, e.g., International Ship Repair Marine Servs., Inc. v. St.Paul Fire Marine Ins. Co., 922 F.Supp. 577 (M.D.Fla. 1996) (recognizing that insurer's claim of violation of duty uberrimaefidei presented disputed issues *Page 1135 
of fact as to whether insured failed to disclose material information when applying for insurance). The trial court resolved this question of fact in favor of Christiansen Marine. Because the trial court's determination is not plainly or palpably wrong or against the preponderance of the evidence, we must affirm its judgment on this issue.
 "III. Even if Dogwood's insurance policy was not void at its inception, some of the damages awarded to Christiansen [Marine] were not covered under the policy's terms; the trial court's findings otherwise were clearly erroneous."
St. Paul argues that, if Dogwood's marine-insurance policy was not void in its entirety, $62,514 of the $293,151.53 awarded to Christiansen Marine was not covered under the terms of the policy and was improperly awarded. St. Paul argues as follows: The entire loss on April 23 resulted from the unseaworthiness of Dogwood's barges. The trial court awarded $51,689 (with an additional $10,825 awarded on that amount as postjudgment interest) under the "sue and labor" clause of the St. Paul hull coverage. In order to recover under the "sue and labor" clause of the hull coverage, the underlying loss to the insured's vessels must be covered under the policy. Where the underlying loss is caused by the unseaworthiness of the vessels, no coverage is provided. Therefore, St. Paul argues, Christiansen Marine was not entitled to recover under the "sue and labor" clause of Dogwood's hull coverage.
St. Paul's argument is a non sequitur. The trial court held that St. Paul was estopped from relying on the unseaworthiness of Dogwood's barges as a defense to coverage in this action, because St. Paul had actual and constructive knowledge of the condition of the barges before the loss occurred. If St. Paul is estopped from relying on unseaworthiness as a defense to coverage, it is also estopped from arguing that because the barges were unseaworthy, a particular item of loss is not covered under the policy. If the barges were unseaworthy, St. Paul had actual or constructive knowledge of that unseaworthiness but elected to continue insuring the barges. Under the facts and procedural history of this case, St. Paul is estopped from asserting the unseaworthiness as a defense to a claim for damages. The trial court did not err in including the $62,514 in the amount of damages awarded to Christiansen Marine.
 "IV. The trial court's failure to apply the policy deductible to reduce Christiansen [Marine's] recovery was a misapplication of Alabama Code 1975, § 27-23-2
Ala. Code 1975."
St. Paul argues that the trial court erred by refusing to reduce Christiansen Marine's recovery by the deductible applicable to Dogwood's policy. St. Paul asserts that the deductible due for the April 23 loss is $20,000[21] and that Christiansen Marine's recovery of damages under § 27-23-2, Ala. Code 1975, should be reduced by that deductible, plus the appropriate amount of postjudgment interest, for a total of $24,188.52.
We agree with St. Paul that the trial court should have applied a deductible to Christiansen Marine's recovery of damages. Section 27-23-2, Ala. Code 1975, allows a judgment creditor to recover only "the insurance money provided for in the contract of insurance between the insurer and the defendant. . . ." Thus, the judgment creditor is entitled to recover only the amount due the insured from the insurer *Page 1136 
for the particular claim at issue. Because St. Paul would not have been liable to Dogwood for the applicable deductible, St. Paul is not liable to Christiansen Marine for the amount of that deductible in this action.
However, we disagree with St. Paul's calculation of the amount of the deductible due under Dogwood's policy for the April 23 loss. Dogwood's policy consisted of "hull coverage" (Form SP-39C)[22] and "protection and indemnity" coverage (Form SP-38).[23] The hull portion of Dogwood's policy provided:
 "The sum of $as per schedule shall be deducted from the total amount of any or all claims (including claims for sue and labor,[24] collision liability, general average and salvage charges) resulting from any one claim. This deduction does not apply to claims for total or constructive total loss. For the purpose of this clause each accident shall be treated separately, but it is agreed that a sequence of damages arising from the same accident shall be treated as due to that accident."
A "Schedule of Vessels" was attached to the policy; that schedule listed each barge, the agreed-upon value of each barge, and the premium applicable to each barge. A deductible amount of $2,500 was shown beside each premium.
The protection and indemnity portion of the policy provided:
 "Notwithstanding the foregoing this Company will not pay for:
 "The first $1,000 of claims covered by lines 14, 15, 16, 28, 29 and 30 nor for the first $2,500 of claims covered by any other parts of this policy, but, in no event shall the deductible exceed $2,500 each occurrence. (For the purpose of this clause, each occurrence shall be treated separately, but a series of claims hereunder arising from the same occurrence shall be treated as due to that occurrence.)"
(Emphasis added.)
St. Paul interprets this language to mean that it is entitled to recover, for the April 23 loss, a deductible of $2,500 for each of Dogwood's seven barges insured under the hull coverage of the policy. St. Paul also interprets this language to mean that it is entitled to another $2,500 deductible because coverage for one of the items of loss for which Christiansen Marine was awarded damages was provided under Dogwood's protection and indemnity portion of the policy. We disagree.
Where an insurance policy defines certain words or phrases a court must defer to the definition provided by the policy. TwinCity Fire Ins. Co. v. Alfa Mut. Ins. Co., 817 So.2d 687 (Ala. 2001). However, St. Paul's policy does not define "accident" or "occurrence." Thus, we look outside the policy for the meaning of the words "accident" and "occurrence."
Black's Law Dictionary 1107 (7th ed. 1999), defines "occurrence" to mean "[s]omething that happens or takes place; specif., an accident, event, or continuing condition that results in personal injury or *Page 1137 
property damage that is neither expected nor intended from the standpoint of an insured party." "Accident" is defined as "[a]n unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated." Black's Law Dictionary 15.
In United States Fire Insurance Co. v. Safeco Insurance Co.,444 So.2d 844 (Ala. 1983), the Alabama Supreme Court addressed the meaning of the term "occurrence" for purposes of determining the deductible due from the insured. In that case, the Court concluded that a single occurrence encompassed all the damage proximately resulting from each incident. The United States FireInsurance Court stated that, under Alabama law, "`[a]s long as the injuries stem from one proximate cause there is a single occurrence,'" 444 So.2d at 846 (quoting Appalachian Ins. Co. v.Liberty Mut. Ins. Co., 676 F.2d 56, 61 (3d Cir. 1982)); however, "`if the cause is interrupted or replaced by another cause, the chain of causation is broken and more than one accident or occurrence has taken place.'" 444 So.2d at 847 (quoting 8A Long,Insurance Law and Practice § 4891.25 at 18 (1981)).
Applying the plain language of the policy and the above-quoted definitions and using the opinion in United States FireInsurance Co., supra, as our guide, we conclude that only one $2,500 deductible would have been due from Dogwood for the April 23 loss. From the record, it appears that the loss resulted from one "accident, event, or continuing condition that result[ed] in . . . property damage that [was] neither expected nor intended from the standpoint of [Dogwood]."
In this case, Dogwood's barges were not operating separately and were not involved in separate incidents; they were all bound together and under the control of the same two tugboats. Although the exact cause of the loss has not been identified, the record reflects that one or more of Dogwood's barges took on water while being towed and that this event caused the entire tow to break apart. Christiansen Marine sustained damage as a result. The fact that all seven barges were involved in the incident giving rise to Christiansen Marine's damage does not establish that there were seven "occurrences," for purposes of calculating the deductible due under the policy. Moreover, St. Paul has not offered any evidence to establish that Christiansen Marine's damage resulted from more than one proximate cause or that another cause intervened to break the chain of causation created by Christiansen Marine's tow taking on water.
We also reject St. Paul's attempt to recover a $1,000 deductible under its protection and indemnity coverage in addition to the $2,500 deductible due under its hull coverage. The language of the protection and indemnity coverage expressly states that "in no event shall the deductible exceed $2,500 each occurrence." Because we conclude there has been only one occurrence, and the maximum deductible per occurrence is limited by the terms of the policy to $2,500, the amount of Christiansen Marine's recovery should be reduced is $2,500.
We affirm the judgment in favor of Christiansen Marine insofar as it relates to the trial court's finding that St. Paul is obligated to provide coverage under the policy issued to Dogwood; we reverse the trial court's judgment insofar as it relates to the amount of damages awarded to Christiansen Marine. We remand this cause to the trial court with directions to reduce the damages awarded to Christiansen Marine by $2,500. *Page 1138 
 Conclusion
We affirm the trial court's judgment as to its determination of coverage under the St. Paul policy. We reverse that judgment as it relates to the amount of damages awarded to Christiansen Marine against St. Paul, and we remand this action for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; REMANDED WITH DIRECTIONS.
HOUSTON, LYONS, BROWN, JOHNSTONE, HARWOOD, and WOODALL, JJ., concur.
[1] The only assets Dogwood ever owned were the seven barges at issue in this lawsuit. Subsequent to this incident in the Gulf of Mexico, Dogwood sold the barges.
[2] According to Perry Beebe, a licensed marine surveyor who prepared the surveys in this case, a "hopper" barge is a barge with a large opening in its hull area in which it carries cargo.
[3] According to Beebe, the purpose of a "condition and valuation" survey is to determine the general condition and the estimated value of a vessel.
[4] In the jury trial in the case involving Dogwood and Christiansen Marine, Beebe testified that "it's not uncommon for barges to be in that condition with minor leaks and things. And the way I wrote it up was to — it was my understanding [Dogwood] didn't even own the barges at the time. They were in the process of being bought and sold. And I put down those requirements to — for [Dogwood's] protection, really. . . . And so I put all of these recommendations down. And then [McConnell] called me up and told me that he couldn't get — if I could look at it again because he couldn't get any insurance at that time and — because he hadn't even bought them yet. So I said, well, okay, I'll reword it so that when you take possession of them and you bring them wherever you're going to bring them, you can perform these repairs and put them back in service."
[5] Although it is unclear from the record, we presume that Dogwood completed the purchase transaction at some point before Christiansen Marine left Mobile with the barges.
[6] John Christiansen asserted that he and his tow encountered bad weather, which resulted in one or more of the barges taking on water.
[7] The Form SP-39C — the hull coverage portion of the policy issued to Dogwood — was an "all-risks" policy, although St. Paul argued that it is a "covered-peril" policy. See InternationalShip Repair Marine Servs., Inc. v. St. Paul Marine Ins. Co.,944 F.Supp. 886, 891-92 (M.D.Fla. 1996) (interpreting similar, although not identical, language from a marine hull policy issued by St. Paul and concluding that such language created an "all-risk" policy). The court in International Ship Repair
stated: "Any time an insurer decides to draft an insurance policy which provides coverage for `other causes of whatsoever nature' and `all other perils, losses, and misfortunes,' it intends to provide `all risk' coverage to its insured, not simply a covered `perils' policy." 944 F.Supp. at 892. In this case, St. Paul issued an insurance policy to Dogwood that provided hull coverage for "all other like perils that shall come to the hurt, detriment or damage of the vessel named herein." This language created an all-risks policy.
[8] At trial, Wimberly specifically denied that a trip-risk endorsement was ever discussed during his conversations with Travitz; Travitz did not recall whether such an endorsement was discussed during his conversations with Wimberly.
[9] Christiansen Marine's brief incorrectly states that St. Paul notified Dogwood of its intent to deny coverage on June 22, 1995.
[10] The settlement agreement also provided that, in the event St. Paul was found to have any further liability for the April 23 loss, Dogwood was obligated to return the $25,000 to St. Paul.
[11] Dogwood did not answer Christiansen Marine's complaint and apparently did not otherwise participate in this case.
[12] In its order, the trial court also stated: "Ala. Code §27-23-2 must be read in pari materia with Ala. Code § 27-23-1. Section 27-23-1 makes it clear that upon the occurrence of the loss, liability of the insured is absolute and any agreement between the insurer and insured to deny coverage is void." However, the trial court stopped short of expressly finding that the consent judgment was an agreement to deny Christiansen Marine any coverage under the policy.
[13] St. Paul's director of global marine claims testified that one item of loss — Christiansen Marine's administrative and management costs required to prepare its claim — requested by Christiansen Marine in this action would not be covered under Dogwood's policy with St. Paul. However, the trial court concluded that the costs incurred by Christiansen Marine to prepare its claim were a result of the April 23 loss and thereby were covered under the policy. St. Paul has not appealed this aspect of the trial court's judgment.
[14] On appeal, St. Paul does not challenge the trial court's finding that the policy as issued on April 12, 1995, did not include a trip-risk endorsement or a navigational limit.
[15] St. Paul has withdrawn this argument based on information provided to this Court by Christiansen Marine in its brief. Therefore, we need not address this issue.
[16] Additionally, this same trial judge presided over and heard the testimony in the earlier trial between Dogwood and Christiansen Marine.
[17] We have located only one Alabama case in which this implied warranty is even mentioned; that case is Mobile MarineDock Mutual Insurance Co. v. McMillan Son, 27 Ala. 77
(1855). It is not relevant or helpful to the issues presented here.
[18] The approach of the Fifth Circuit Court of Appeals to the implied warranty of seaworthiness in marine "time" policies has been criticized. See Employers Insurance of Wausau v. OccidentalPetroleum Corp., 978 F.2d 1422, 1434-35, and n. 12 (5th Cir. 1993).
[19] We note that St. Paul quotes language from EmployersInsurance of Wausau in support of its argument. However, the quoted language refers to a "voyage" policy; the policy at issue in this case is a "time" policy. A time policy is "[a]n insurance policy that is effective only during a specified period."Black's Law Dictionary 810 (7th ed. 1999). A voyage policy is "[a] marine-insurance policy that insures a vessel or its cargo during a specified voyage." Black's at 811.
[20] Even the Employers Insurance court recognized that the implied warranty of seaworthiness could be waived by an insurer, under the proper circumstances.
[21] At trial, St. Paul asserted that the proper deductible amount was $35,000. Apparently, St. Paul has abandoned that calculation for the $20,000 amount asserted on appeal as the deductible due under the policy.
[22] Hull coverage insures the marine vessel and is somewhat equivalent to collision coverage in automobile insurance.
[23] Protection and indemnity coverage (sometimes referred to as "P I" coverage) insures the owner against liability to others for damage caused by the vessel or its crew.
[24] Although subject to the language of the policy, generally, a "sue and labor" clause makes the insurer liable, in addition to its liability for loss or damage to the vessel, for expenses reasonably incurred in attempting to recover or preserve the insured property.